And the doctrine of that case was even more emphatically asserted in Holbrook v. N. J. Zinc Co., 57 N. Y. 616, in which the Court of Appeals declared that:

"It cannot now be denied that if a corporation having power to issue stock certificates does in fact issue such a certificate, in which it affirms that a designated person is entitled to a certain number of shares of stock, it thereby holds out to the persons who may deal in good faith with the person named in the certificate that he is the owner, and has capacity to transfer the shares. This proposition does not rest upon any view of the negotiability of the stock, but on general principles appertaining to the law of estoppel. * * * When the defendant issued its certificates to William T. Rich it affirmed to all persons who might deal with him that he owned a certain portion of the capital stock, and had full power to transfer it. Any purchaser has a right to rely upon this statement, and to claim the benefit of an estoppel in its favor."

The sum of the whole matter is succinctly expressed by Justice Davis in the Lanier Case, supra, where, referring to stock certificates of national banks, which institutions, it seems, are not permitted to make valid loans or discounts upon the security of their own stock, he said:

"It is no less the interest of the shareholder than the public that the certificate representing his stock should be in a form to secure public confidence, for without this he could not negotiate it to any advantage."

In quoting this language with evident approval, the Court of Appeals in a recent case (Buffalo German Ins. Co. v. Third National Bank, supra) saw fit to add:

"Nor can it be said that this plaintiff, when offered by Levi the certificates of stock as collateral security for a loan of money, was chargeable with notice of any lien of the bank thereon. The certificates were in his possession, and were delivered to the plaintiff, and the printed matter thereon was of no importance, inasmuch as the public law, under which the bank was organized, prohibited it from making any loan or discount on the security of the shares of its own capital stock. The plaintiff could not be bound by notice of something which the law prohibited."

Which, it seems to us, is equivalent to saying that in that case the notice was no notice, and that, without any notice, a bona fide transfer of bank stock for value confers absolute and unqualified ownership upon the transferee. Upon the authority of these and other like precedents our conclusion is that the plaintiff's title to the 30 shares of stock embraced in certificate No. 72 is superior to and freed from the lien of the bank, and that the judgment appealed from should therefore be affirmed.

Judgment affirmed, with costs. All concur.

---

### SWART v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. March 10, 1903.)

1. RAILROADS—ACCIDENT AT CROSSING—NEGLIGENCE.

In an action against a railway company for injury at a crossing, whether defendant's servants were guilty of negligence in failing to ring the bell or sound the whistle, when the train was running at a speed of 50 miles an hour, was a question for the jury.

2. SAME—ACCIDENT AT CROSSING — CONTRIBUTORY NEGLIGENCE — LOOK AND LISTEN.

Plaintiff approached defendant's tracks on a north and south road, driving a horse at a walk. He testified that when at a distance of 25 feet from the track he looked toward the west, but "did not see" any train, nor did he hear any. The track was in plain view for some 750 feet. The evidence showed conclusively 'that the train was within at most 625 feet of the crossing. The day was clear, and the train was composed of 35 or 40 cars, and was running at a high rate of speed. *Held*, plaintiff was guilty of contributory negligence in law.

3. SAME—CONTRIBUTORY NEGLIGENCE—LOOK AND LISTEN—FAILURE TO SEE.

In an action against a railroad company for injury at a crossing, a statement by plaintiff that he "looked, but did not see" an approaching train, did not raise a question for the jury on the issue of contributory negligence, when it was demonstrated that, if he had looked intelligently, he would have seen the train.

Adams, P. J., dissenting.

Appeal from Trial Term, Cayuga county.

Action by Almeron Swart, an infant, by his guardian, against the New York Central & Hudson River Railroad Company. From a judgment for defendant, and from an order denying a new trial, plaintiff appeals. Affirmed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, HISCOCK, and NASH, JJ.

William S. Jenney, for appellant.
Albert H. Harris, for respondent.

McLENNAN, J. The facts, so far as material, may be briefly stated. At about 4 o'clock in the afternoon of October 6, 1900, a bright, clear day, there being no wind or storm of any kind, the plaintiff, who was then nearly 16 years old, a bright, active, intelligent lad, was struck and severely injured by one of the defendant's freight trains at a highway crossing of the West Shore Railroad about a mile northwest of the village of Port Byron, in the county of Cayuga. To recover damages for the injuries thus received this action is brought. The highway at the place in question extends substantially north and south, and is crossed at right angles by defendant's railroad. Immediately west of the crossing the rails are laid upon an embankment, 5 or 6 feet high at its greatest elevation, for a distance of about 250 feet, then for about 500 feet through a cut 30 feet wide at the base and 80 feet at the top. Its greatest depth is near the middle, and is between 9 and 10 feet, and it runs out to nothing at either end. From the west end of the cut, which is about 750 feet from the crossing, the tracks are on a level with the adjoining lands, and are substantially straight for a distance of more than a mile from the crossing. Approaching the railroad upon the highway from the north, and at a point about 113 feet from the north rail of the track, some portion of a train of cars can be seen for the entire distance of 500 feet west of the crossing. Then a hedge some 10 or 12 feet in height, upon the west side of the highway, extending towards the south for a distance of about 90 feet, virtually obstructs the view to the west, but from the south end of the hedge to the north rail of defendant's track a distance of at

least 25 feet the tracks of the railroad to the west and a train approaching thereon are in plain view for a distance of at least one mile. In other words, at any point in the highway between the south end of the hedge and the north rail at the crossing the tracks of the defendant's railroad are in plain view from the crossing clear through the cut a distance of 750 feet and for a considerable distance still farther to the west; and, of course, a train composed of an engine and 35 or 40 freight cars, if upon such portion of the railroad, could be seen even more distinctly than the roadbed.

Upon the day in question the plaintiff was driving a single horse, attached to a milk peddler's wagon, south upon the highway. He was entirely familiar with the surroundings; was accustomed to pass over the crossing frequently. The horse was gentle, and not afraid of the cars. The plaintiff was reading a book, which lay open in his lap. He was holding the reins with one hand, and the horse was upon a walk. When about 500 feet from the crossing, he had a view of the railroad to the west for some distance, and at that point looked to see if a train was approaching, and saw none. He knew where the crossing was located, and that he was approaching it. He then stopped reading, although the book remained open in his lap, and proceeded on his way until he reached the hedge which obstructed his view to the west. He then looked to the east, and saw no train in that direction. When he reached the south end of the hedge, he testified that he again looked to the west; that he then could see and did see the tracks of defendant's railroad from the crossing clear through the cut a distance of about 750 feet, and that he saw no train; that he could not see west of the cut, because the sun shone in his eyes, and that he looked to the east, and saw a hand car some distance east of the crossing; that he looked long enough to determine which way the hand car was going; that his horse during this time was proceeding on a walk towards the crossing, and that, as the horse got upon the tracks, he again looked to the west, and saw the freight train approaching from that direction, which was then close upon him, and the collision occurred. The plaintiff testified explicitly that immediately after passing the south end of the hedge he looked to the west for the purpose of ascertaining whether or not a train was approaching the crossing from that direction; that he saw none; although, as we have seen, he states that he saw the tracks of the defendant's road for a distance of 750 feet from the crossing. He also testified that he listened for signals; that he heard none, and heard no sound or noise which would indicate that a train was approaching; although concededly no other trains were in the vicinity, and there were no other noises which apparently could prevent hearing an approaching freight train upon a day when there was no wind or other storm. There is evidence tending to show that the freight train in question, as it approached the crossing, was going at the rate of 50 miles an hour; that the bell upon the engine was not rung or the whistle sounded. In fact, the evidence bearing upon the question of the defendant's negligence was of such a character as to make it a question of fact to be determined by a jury. The only question which need be considered upon this appeal is whether or not the learned trial court properly decided that, as matter

of law, the plaintiff failed to establish that he was free from contributory negligence.

The evidence demonstrates beyond the possibility of doubt that when the plaintiff passed the south end of the hedge, and was at a point in the highway 25 feet from the north rail at the crossing, the freight train was in his plain sight. If the horse was traveling at the rate of only 2 miles per hour, while traversing the 25 feet between the south end of the hedge and the crossing (the lowest speed suggested by the evidence), and the train was going at the rate of 50 miles an hour (the highest speed estimated by any witness), then the train was going 25 times faster than the horse, and consequently, when the plaintiff was 25 feet from the crossing, the train was 625 feet away, and at a point in the cut where the plaintiff testified he was able to see, and actually did see, the track and roadbed of the defendant's railroad when he was at a point immediately south of the hedge. If the horse was going faster and the train slower, then it would be relatively nearer the crossing. There is no pretense that the sun interfered with the plaintiff's view of that portion of the railroad over which the train was then passing. According to the plaintiff's testimony, the sun only prevented him from seeing the railroad west of the cut. The tracks from the crossing west for a distance of 750 feet were in his plain view, and (as he testified without qualification) were actually seen by him after passing south of the hedge. Construing the evidence most favorably to the plaintiff, when he had reached that point the train was at about the middle of the cut. The plaintiff's eyesight was good. His attention was in no manner distracted. He had in mind the fact that he was approaching the crossing, and his horse was gentle, and under perfect control. It follows that if the plaintiff, after he passed the hedge, looked to the west intelligently—looked with his mind, and not merely with his eyes—he saw the train, but gave no heed to it, or else that he attempted to cross in front of it.

Under the circumstances disclosed by the evidence in this case, if the plaintiff did not look to the west after passing the south end of the hedge, he was guilty of negligence as matter of law, and therefore the direction of a verdict in favor of the defendant was proper. It cannot be that "look" simply means that a person with his eyes open shall turn his head in a particular direction. The word, as used and understood in the decisions, must mean that he "looked" intelligently, and in such manner that what his vision disclosed might influence his action or conduct. If the plaintiff in this case looked to the west in that sense after passing the south end of the hedge, he saw the approaching freight train; saw it plainly and distinctly, because it was in full and plain view. If he did not look in the sense indicated, in law he did not look at all. A blind man may say, "I looked, and did not see," and it may be said of an idiot that he looked, and no impression was made upon his mind; but not so with a person who has good eyes and a sound intellect.

The question in this case is simple. If, when at a point in the highway 25 feet from the crossing, the plaintiff looked to the west for the purpose of seeing—as in law he was bound to do—he in fact saw the train with which he came into collision. If he saw it, and made no

effort to avoid the collision—as concededly he did not—he was guilty of negligence as matter of law. If he did not look in the sense indicated, he was guilty of negligence, and a recovery cannot be had. This court·has held (Fiddler v. N. Y. C. & H. R. R. Co., 64 App. Div. 95, 71 N. Y. Supp. 721) that a statement by a plaintiff that he looked and did not see does not raise a question of fact when it is demonstrated according to the laws of nature and common experience that, if he looked, he did see. It seems to us that it would be a travesty upon the administration of justice to hold that a plaintiff may raise a question of fact which must be submitted to and determined by a jury simply by testifying ·that he looked, but did not see a train composed of an engine, the top of which was 14 feet above the rails, and of 35 or 40 freight cars, making a total length of more than 1,000 feet, when all of it is within his plain view. If such is the law, then all that a plaintiff need do in a crossing case in order to make a question of fact for a jury is to testify that he looked, but did not see. No stronger case can ever be presented illustrative of the proposition than the one at bar. In view of our· decision in the Fiddler Case, supra, we are constrained to hold that the plaintiff was guilty of contributory negligence as matter of law, and that the decision of the learned trial court was correct.

It follows that the judgment and orders should be affirmed, with costs. All concur, except ADAMS, P. J., who dissents.

ADAMS, P. J. (dissenting). While the evidence tending to establish negligence upon the part of the defendant was quite conflicting, and not altogether satisfactory, that question was fairly and properly submitted to the jury by the learned trial ·court; and, inasmuch as the evidence of the plaintiff and his witnesses, if believed, was sufficient to support the conclusion reached by the jury, I do not very well see how their verdict can be disturbed, so far as this branch of the case is concerned. I pass, therefore, to a consideration of the more difficult proposition involved in the defendant's contention that the plaintiff was, as a matter of law, guilty of contributory negligence in his manner of approaching the crossing in question.

It appears that the plaintiff was entirely familiar·with this crossing; that he passed over it frequently; and that because of his familiarity with his surroundings he looked·in both directions as soon as he had passed the house of Mr. Howland, which stood upon the west side of the highway, and some 500 feet north of the defendant's track. He further testified that he then proceeded on his way until he reached the hedge, when, as he "couldn't see to the west," he looked towards the east, and saw no train; that immediately upon passing the south end of the hedge he again looked towards the west; that he could see the track up to and through the cut, but that the sun shone in. his eyes in such manner as to prevent his seeing anything west of the cut; that he saw nothing of the·train, and that he then looked to the east, and saw a hand car some distance east of the crossing; that he looked long enough to determine the direction in which this car was going, by which time his horse was upon the track; that he then looked west again, and saw the train close upon him;

and that he recollected nothing further until he found himself in his bed at home.   He also testified that he listened for signals, and heard none.   This evidence, if it is to be believed, indicates that the plaintiff not only took such precaution as the law requires of a person situated as he was, but also that he manifested more than ordinary concern for his self-preservation.   It is urged, however, that his testimony is absolutely incredible, and in support of this contention attention is called to the evidence of two men who were driving north upon this same highway, both of whom testified that they met the plaintiff north of the crossing, and that they saw the train while they were between the crossing and the south end of the hedge; also to the evidence of one of the men upon the hand car that he had no difficulty in seeing the train as it approached the crossing, and to that of the fireman and another man upon the locomotive, each of whom testified that the plaintiff was seen by him from the time the horse emerged from the south end of the hedge until the collision occurred. It is also made to appear by the plaintiff's own admission that up to the time he passed the Howland house he had been engaged in reading a book of some kind as his horse jogged along, although he insisted that from that point on he did not look at the book, notwithstanding it lay open in his lap.

It is not to be denied that the circumstances above detailed lend considerable force to the defendant's contention that the plaintiff either did see the approaching train, and endeavored to cross the tracks in advance of it, or else that he testified to that which was absolutely untrue; and the theory first advanced is somewhat fortified by the evidence of the fireman and his companion upon the locomotive, who testified that when the horse's head was 10 or 12 feet from the track the plaintiff pulled up on the reins as if intending to stop, and that he then apparently changed his mind, and loosened up on the horse, which thereupon started ahead, and jumped in front of the engine.   But while this inference might be reasonably deducible from the evidence, it cannot be said that it is necessarily so; and it is but fair to suggest that there are some additional circumstances in the case which the jury had a right to take into consideration in determining the credibility of the plaintiff's story.   In the first place, he says that at the time of the accident the foliage was upon the hedge, which rendered it impossible to see through it; and this fact is apparently undisputed.   Then again, the distance between the hedge and the defendant's track was but 24 or 27 feet at the most, and the defendant's fireman testified that when he first saw the plaintiff the hind wheels of the wagon were hidden by the hedge, and the horse's head was but 10 or 12 feet from the track.   This certainly did bring the plaintiff's opportunity for observation within rather narrow limits, and, when due consideration is given to his statement that his attention was attracted to the hand car at the east, and that he was more or less blinded by the setting sun as he looked to the west, it must be conceded, I think, that a question of fact was presented for the jury, which could not be taken from them by the court (and this, in effect, is what the order appealed from accomplished) without running counter to the rule laid down by a recent decision of the court of appeals.

McDonald v. M. S. R. Co., 167 N. Y. 66, 60 N. E. 282. This court has taken occasion to say in a comparatively recent case (Seeley v. N. Y. C. & Co., 8 App. Div. 407, 40 N. Y. Supp. 866) that, where a party testified that he looked and listened before attempting to cross in front of an approaching train of cars, a recovery is not impossible because it can be shown that the train might and ought to have been discovered by one who was upon the lookout for it. This case was cited with approval and followed by the Second Department in Turell v. Erie R. R. Co., 49 App. Div. 94, 63 N. Y. Supp. 402, and again by this court in Branch v. N. Y. C. & H. R. R. Co., 39 App. Div. 439, 57 N. Y. Supp. 344, which was a case strikingly similar in many of its circumstances to the one now under consideration. In a still more recent case, in which it was made to appear with quite as much certainty as in the present one that the party injured might have seen the locomotive which struck him had he taken the slightest pains to look for it, this significant language was used by the Court of Appeals in affirming a judgment in favor of the plaintiff:

"But it may be asked, if he [the plaintiff] looked towards the east at all, why he did not see the coming train, and avoid it? That question may be asked, and generally is, in every case of this character. It is an argument to be addressed to the jury, and not to a court dealing with questions of law only." Zwack v. N. Y., L. E. & W. R. Co., 160 N. Y. 362, 54 N. E. 785.

In view of this decision, which apparently goes to a much greater length than did this court in the Seeley and Branch Cases, it is difficult to see how the direction of a verdict in favor of the defendant, in the circumstances which have been detailed, can be sustained, whatever view may be entertained as to the real merits of the case.

I have not deemed it necessary to advert to the fact that the plaintiff was but 15 years of age at the time of receiving his injuries, for the case seems to have been tried upon the theory that he was sui juris, although the jury were very properly instructed that they might take the plaintiff's age into consideration in determining whether or not he exercised such precautions for his own protection as might reasonably be expected of a person of his years and experience.

Upon a careful review of all the facts of the case, I am led to the conclusion that it was error for the trial court to direct a verdict, and consequently am constrained to dissent from the prevailing opinion.