SUSIE CONNELLY, *Admx., etc. v.* THE VIRGINIAN RAILWAY
COMPANY *et al.*

(No. 9229)

Submitted February 10, 1942. Decided April 7, 1942.

RILEY, JUDGE, dissenting.

*W. L. Lee, John R. Pendleton* and *W. C. Plunkett,* for
plaintiffs in error.
*T. A. Myles* and *J. W. Eary,* for defendant in error.

KENNA, JUDGE:

This action was instituted in the Circuit Court of Fay-
ette County by the administratrix of Walter Connelly for
the purpose of recovering damages for death by wrongful
act against the Virginian Railway Company, M. L. Woods
and Walker Hall, and resulted in a verdict and judgment
in favor of the plaintiff for the sum of twenty-five hun-
dred dollars against the railroad and Woods, Hall having
been dropped before submission to the jury. This writ of
error was granted upon the application of the remaining
defendants.

There are three grounds of assigned error, the second of which covers the giving on behalf of the plaintiff of two allegedly erroneous instructions, and the third the refusal to give five allegedly proper instructions on behalf of the defendant. Since, in our opinion, the trial court erred in refusing to direct a verdict for defendants, that question being covered by the first assignment of error, due to the insufficiency of the plaintiff's proof to sustain that verdict, it is unnecessary to consider the other assignments of error.

The following statement of facts is, of course, not exhaustive but, we hope, includes all salient circumstances, giving to the plaintiff the benefit of all conflicting testimony, save where there is a very clear preponderance for the defendant, and all reasonable inferences to be drawn therefrom:

In the early afternoon of March 16, 1940, plaintiff's decedent was struck and almost instantly killed by a coal train of the defendant on its Oak Hill Branch a little south of Summerlee in Fayette County. The train was composed of twenty-two loaded, and one empty, fifty-ton freight cars coupled to the front of the engine, the engine, the engine's tank and a caboose attached to the back of the tank. It was on its daily run from Oak Hill Junction to Lochgelly and back, and, since there was no way of turning the engine on the Oak Hill Branch, was backing, followed by the loaded cars and empty and preceded by the caboose and tank. The train crew consisted of a conductor, an engineer, a fireman and two brakemen, all of whom were on active duty in their appropriate positions excepting one brakeman, who, at the time of the accident and immediately preceding it, was eating a sandwich in the caboose. The decedent was on the railroad track of the defendant at the south end of what is called a side hill cut and at a point approximately eight hundred feet south of the crossing formed by the railroad and State Highway Number Eighteen, being south of Summerlee and north of Oak Hill. Between him and the approaching train there was what is called a reverse curve. At this point in

the direction toward Oak Hill, the roadbed of the defendant is on a one-half per cent downgrade, and the train was "drifting," or moving without the application of power, its speed being between twelve and fifteen miles an hour.

Decedent had been with his two brothers operating their family truck and "picking up" coal that morning until about ten-thirty. It was Saturday and "pay day." He left them near the Summerlee tipple and went to a nearby pool room where he stayed until between noon and one o'clock, and is known to have drunk three bottles of beer. He was wearing a red sweater with a white letter "O" on its front and a red "toboggan." The only person, according to the record's showing, who saw decedent alive after he left the pool room, in addition to the train crew, was a colored man around eighty years of age who lived near the place of the accident and went regularly in the early afternoon to a nearby spring to procure drinking water, and who was making his daily trip for that purpose at the time of the accident and witnessed the occurrence. This witness had died at the time of the trial, and his deposition, taken by the plaintiff, was used.

There is no contest concerning several pictures introduced by both the defendant and the plaintiff, the defendant's map of its right of way near the scene, nor the distances on the ground. There is, however, considerable variance in the estimated eventual distances or relative positions of moving objects when different occurrences took place. The decedent was not standing when struck by the defendant's caboose. We believe that the record discloses no material conflict in the testimony up to this point.

Although the testimony is in substantial agreement as to Connelly's location, there is a material conflict as to the posture occupied by him at the time of impact. As has already been stated, he was on the eastern, or left, side of the defendant's rails in the direction that the train was moving. It is the contention of the plaintiff that he was sitting upon the end of the defendant's ties, and that

of the defendant that he was lying upon the end of the ties with his head in the direction of the oncoming train. It is obvious that the contention of the plaintiff, if sustained, makes the decedent's red sweater and cap far more conspicuous than would that of the defendant, and consequently, would result in it being far more likely that the train crew of the defendant, either wantonly and knowingly injured him or by the exercise of a very slight degree of care could have realized the danger. Both counts of the declaration allege distinctly that Walter Connelly, at the time his injury occurred, was unconscious, so that it is unnecessary to discuss warnings of the train's approach.

Under the admitted circumstances, we believe that the decedent certainly occupied the position of either a licensee or that of a trespasser, and that in either case, the defendant railroad company has not been shown to have failed to perform a duty that it owed him. It is not contended that Connelly occupied the position of an invitee. We think that there are certain very definite reasons for not regarding him as a licensee.

It is virtually admitted that the right of way, that is to say, the roadbed and trackage of the defendant between Summerlee and Oak Hill, had been used by the residents of the neighborhood for a number of years for their convenience in going and coming, and, in substance, that in so far as pedestrians were concerned, the railroad had acquiesced in that use by persons in normal condition and with normal faculties of observing and avoiding dangers. For the purposes of this case, the defendant undoubtedly was required in the location of the accident to maintain a reasonable lookout for that class of pedestrians. By acquiescing in their use of its exclusive right of way, it owed them, as distinguished from trespassers, that duty. We have been referred to no West Virginia case and have found none that further enlarges the owner's duty to a licensee. The difficulty here that we pass over for the time being is to classify Connelly as a licensee.

For the sake of discussion, let us admit that Connelly, a

man of the age of thirty-eight, was sitting at the end of a sidehill cut upon a tie at the left of defendant's track with his head in his arms wearing a red sweater and cap, unconscious as alleged, on a clear day in the early afternoon. The evidence further shows that defendant's train was backing toward him, headed by a caboose and the locomotive's tank; that there was a lookout by the conductor and one of the brakemen from the platform of the caboose and that both the engineer and firemen, the first at the left of the engine's cab and the other at the right, were observing; that the conductor was the first to see Connelly, and when he first saw him he did not realize for several seconds that the object was a human being. When he did awake to that realization, he shouted and threw up his hand to signal the engineer, and at the same time "kicked the angle valve open," that being a device to the left of the drawhead under the platform of the caboose, the effect of opening it being an instantaneous application of the emergency brake. The brakeman inside the caboose, hearing the ejaculation of the conductor, at once pulled the overhead emergency cord. This also had the effect of immediate application of the emergency brake. The engineer, the curve that the train was then on being convex from his side of the cab, at once applied the emergency brake, released the sand and leaned out of his window in order to improve his visibility and for the first time realized that there was a man, as he thought, lying at the edge of the ties to the left of the track. Though the estimates of distances do not coincide concerning how far away from the decedent the train was when the emergency was applied, it, according to the testimony, was within between sixty and one hundred feet from him at that time. Following the impact, the train ran the length of the caboose, tank and engine, excepting the length of the cowcatcher. The testimony is to the effect that a train of the size and weight of the one that was involved, moving between twelve and fifteen miles an hour upon a dry day, upon the application of the emergency brake and sand, would stop within one hundred fifty feet.

We believe that upon this showing, even regarding the decedent as a licensee, there has been no breach of duty shown, it not being even questioned that the conductor, engineer and other members of the train crew were all possessed of normal vision and normal faculties otherwise.

The West Virginia case followed by the trial judge in declining defendant's motion to set the verdict aside is the case of *Barron* v. *B. & O. Railroad Co.*, 116 W. Va. 21, 178 S. E. 277, quoting the following from the second syllabus: "A railroad must exercise ordinary care, commensurate with the risk of injury, when operating its trains at a place where persons may be expected to be on the track." In the *Barron* case the trial court had directed a verdict in favor of the defendant railroad company, entered judgment accordingly; and in Judge Hatcher's opinion is a statement of the reasons impelling this Court to sustain that judgment, although the language quoted without qualification apparently would require a finding of fact by a jury in all cases brought by persons injured at a place on a railroad track where persons must be expected to be. That, however, cannot be taken to be the rule established in the *Barron* case for the simple reason that the lower court was affirmed for having directed a verdict for the defendant, and if it is correct to say that a syllabus must be read in connection with the facts of the case, we do not believe that the second syllabus should be accepted as the statement of a general principle of law.

Reverting to the fact that the defendant practically concedes that in this vicinity, pedestrians were licensed to use its track as a walkway, the clearest statement of the railroad company's duty that we have been able to find in a West Virginia case is the fourth syllabus in *Raines* v. *Chesapeake & Ohio Railway Co.*, 39 W. Va. 50, 19 S. E. 565, 24 L. R. A. 226, which reads as follows: "If any apparently capable person, and one apparently in the possession of his faculties, is seen walking on a railroad track, the servants of the company running the train having given such signals, as are required, have a right to act on the

presumption, that such person will step aside in time to remove himself from danger." Certainly the railroad company would be under no obligation to anticipate the presence of unconscious persons on its track, and if the duty it owes to licensees is to maintain a reasonable lookout and to warn of approaching danger, the failure to give the warning would certainly not be the proximate cause of injuring an unconscious person. We therefore believe that even regarding Walter Connelly as a licensee, the trial court erred in not directing a verdict for the defendant.

Can it be said correctly, however, that the decedent was a licensee? Had the railroad company consented to or acquiesced in a similar use of its property? We believe that for the purposes of this case, it has been established by a clear preponderance of the testimony that the decedent when he was struck was lying across the end of defendant's ties just outside the track. The plaintiff alleges that he was unconscious, so that the only way to prevent injuring him was to discover his presence, realize that he was a human being and bring the train to a dead stop so that the train crew could remove him from the track without injury. Certainly, it cannot be said that the railroad company, due to its not having objected to the use of its right of way by pedestrians, was obliged to accept persons so using its property as licensees. Undoubtedly, to do so would be to impose upon it a duty far beyond the scope of any implied agreement. We think that it is far more logical to say that although when the decedent came upon the railroad company's right of way, the likelihood is that he was a licensee, but that when he ceased to use its property in the manner it was obliged to permit, lay down upon its ties and became unconscious, he at once became a trespasser to whom it owed the duty to refrain from deliberate or wanton injury.

We must confess that we have been able to locate but one case in which the above question is a point of decision, and very few in which it is even referred to. In the case of *Smith et al. v. International & G. N. Railroad Co.*,

34 Tex. Civ. App. 209, 78 S. W. 556, there will be found a brief discussion based upon the following second syllabus: "The license to use a railroad track as a thoroughfare for pedestrians does not include a license to use the same for sleeping and sitting purposes, and persons so using it are trespassers, to whom the company owes no duty except to use every means to avoid injuring them after discovering the perilous position." See also, Cooley on Torts (4th Ed.), Vol. 2, p. 257, and Studies in the Law of Torts, by Bohlen, 178. Perhaps it is a long cry, but for the purposes of illustration, we direct attention to the well recognized principle of prescriptive easement, to which we think the rights of a licensee are slightly similar, and to the fourth syllabus in the case of *Foreman* v. *Greenburg,* 88 W. Va. 376, 106 S. E. 876, 877: "When an easement has been acquired by prescription, the extent of the right so acquired is measured and determined by the extent of the user out of which it originated."

Looking upon the plaintiff's decedent as a trespasser to whom the defendant owed no positive duty, we believe that the fifth and sixth syllabus points in the previously cited case of *Raines* v. *Chesapeake & Ohio Railway Co.,* 39 W. Va. 50, 19 S. E. 565, 566, 24 L. R. A. 226, which refer specifically to a trespasser upon the property of a railroad company fit the circumstances of this case exactly. They read as follows:

> "If those running a railroad train discover a trespasser in imminent danger on the track, they must use all reasonable exertions to avoid inflicting injury; otherwise, the company will be responsible."
>
> "But, if they omit no duty after becoming aware of his danger, the railroad company will not be responsible for such injury."

For the foregoing reasons, the judgment of the Circuit Court of Fayette County will be reversed and the case remanded with direction to enter judgment for the defendant.

*Reversed and remanded.*

RILEY, JUDGE, dissenting:

I am unable to find in *Raines* v. *Railway Co.*, 39 W. Va. 50, 19 S. E. 565, 24 L. R. A. 226, the pertinency which the majority of the Court attaches thereto, for it is my understanding that the principle enunciated therein is based upon a situation where decedent was in full possession of his faculties and the Court indulged the presumption that one so possessed "will use his senses and seasonably remove himself from danger—that he can and will protect himself." The points of the syllabus quoted in the majority opinion from the *Raines* case reflect a factual situation dissimilar from that in the present record. The majority opinion, characterizing decedent a trespasser upon his becoming unconscious, measures defendant's duty as one "to refrain from deliberate or wanton injury," yet the language in the *Raines* case says, in part: "A railway company running its train is bound for the safety of such train to keep a reasonable lookout for trespassers on its tracks * * *." Judge Holt, in that case, recognizes that there are variant types of trespassers, among them those not capable of looking out for themselves, while *Gunn* v. *Ohio River R. Co.*, 42 W. Va. 676, 26 S. E. 546, 36 L. R. A. 575, negatives the presumption indulged by the Court in the *Raines* case where, in point four of the syllabus, it held "that is not the rule as to children of very tender years, or persons plainly and obviously disabled by deafness, intoxication, sleep, or other cause from taking care of themselves." So, under the cases discussed, it is seen that there is a duty to maintain a lookout for a helpless trespasser. See also, *Stuck* v. *Railway Co.*, 76 W. Va. 453, 86 S. E. 13, which compels lookout for trespassers upon a railway track "as is reasonably consistent with the proper performance of their duties in running the train."

Is the rule of *Barron* v. *B. & O. Railroad Company,* 116 W. Va. 21, 178 S. E. 277, 278, as stated in point 2 of the syllabus, yet the law in this jurisdiction? The majority opinion would indicate that it is not, yet the syllabus thereof is silent thereon. That rule merely made applicable to railway cases the doctrine which this Court has em-

ployed in other cases where the negligence of two or more parties was involved. *Koontz* v. *Whitney,* 109 W. Va. 114, 153 S. E. 797; *Wiseman* v. *Terry,* 111 W. Va. 620, 629, 163 S. E. 425. While true, as stated in the majority opinion, the trial court (in the *Barron* case) was affirmed for having directed a verdict for defendant, yet it is clear from a careful reading of the *Barron* opinion that it was the lack of evidence which impelled such affirmance. That opinion reads, in part:

> "The population of that community was not shown; and neither was it shown that the public was accustomed to use the track at the hour of the accident. In the absence of evidence on those points the case does not develop the need of any particular precaution by the trainmen at the time and place of the accident. The witness who testified there was no light on the front car stated there were lights on the engine. And there was sufficient light from some source (not specified) for him to discern separately the cars both in front of and behind the engine. If the train was thus visible to the only witness who observed it, we cannot say as a matter of law that the failure to have a light on the front car at the place and the hour of the accident was a failure of ordinary care. When the facts are undisputed, negligence is a question of law for the court."

What has been said questions the correctness of the Court's pronouncement of the railway company's duty to a trespasser. Under the evidence adduced, it was not a question of duty to maintain a lookout, for the testimony unequivocally establishes that the railway employees had undertaken to perform that duty. The real issue is whether, having assumed to do so, defendants by the exercise of such degree of care as was commensurate with the circumstances could have avoided striking plaintiff's decedent. The jury answered in favor of decedent's administratrix, and there is substantial evidence to justify its conclusion. The doctrine in the majority opinion, I submit, is contrary to our former decisions. To say that a railroad company is under no duty to a helpless person—though a

trespasser—except not wilfully or wantonly to injure him, ignores the factor of train operations in densely populated communities, and, as the facts of the instant case clearly show, would free railroad companies from liability where their employees have a clear and unobstructed view of a helpless person for a distance sufficient not only to see him, but under proper operation of the train to keep from killing him. It would permit employees, as it did in this case, to be derelict where using their eyes would have saved a human life. The duty not to injure wilfully or wantonly arises upon actual discovery, and the point of discovery will generally be where it serves the living rather than the dead.

For these reasons I respectfully dissent.