166 P.2d 825

**BARRY v. SOUTHERN PAC. CO. et al.**

No. 4719.

Supreme Court of Arizona.

March 4, 1946.

Krucker, Fowler & Dodd and Fred W. Fickett, all of Tucson, for appellant.

Knapp, Boyle & Thompson and Arthur Henderson, all of Tucson, for appellees.

La PRADE, Judge.

Appellant filed this suit to recover damages for personal injuries suffered by him by reason of the alleged negligence of the defendants. The individual defendants were the engineer, fireman, and switchmen in charge of the company's train at the time of the accident. At the close of plaintiff's case the court peremptorily instructed the jury to find for the defendants. The proof showed that the accident occurred in South Tucson, a few feet from the intersection of the company's tracks and South Sixth Avenue. This street is a heavily traveled arterial highway carrying traffic of two U. S. Highways and leading to Nogales and Bisbee. The surrounding area is moderately populated; tourist courts, bars, cafes, gasoline service stations, and stores are situated in all directions in the immediate vicinity. Two blocks to the west and southwest there are located the Arizona Children's Home and the Mission View Public School. The photographic

exhibits indicate that there is an area approximating the size of a city block that is vacant on the southwesterly side of the railroad tracks and immediately west of South Sixth Avenue. This area was covered with brush and desert flora indigenous to that territory. On the south and west side of this area there were numerous private dwellings. Leading in a southwesterly direction from the west curb of the street, a few feet north of the point where the company's track intersects it, there was a fairly well beaten footpath leading out into this vacant area. This footpath had been used continuously for many years by residents of the neighborhood as a short cut across the vacant block. Fifteen feet north of the track, along the west curb of the street and directly opposite the path as it crossed the track, there was a bus stop where for many years passengers of two different bus lines had boarded and alighted. Also at this point the school buses stopped to discharge children who had habitually used the path for many years. The last daily bus was shown to go to this area about 11:45 p. m. The company had actual knowledge of the use of this pathway extending over its tracks by the residents of the neighborhood. This use was extensive, at least up until the hour of midnight. In a neighborhood as thickly populated as was this part of the city, it is not unreasonable to suppose that there might be isolated instances of foot travel on this pathway across the tracks by a few persons who might have occasion to be out well after midnight. If there was any use after midnight, it was not appreciable.

On the evening of April 24, 1941 (9 p. m. to 1 a. m.), appellant visited a bar called the Spanish well, located on the west side of Sixth Avenue, a distance of between three and four blocks north of his home and the railroad track. At one o'clock in the morning of April 25th, when the establishment closed, he walked south on the west side of the street, but not toward his home. A short while later, at a time when he was apparently attempting to cross the tracks at or near the pathway, he stumbled or voluntarily lay down in the middle of the track. In any event he was too inebriated to arise, and went to sleep, using the roadbed between the rails for a bed. The pathway across the tracks was about 23 feet from the curb of the street. The railroad track involved was used by the company approximately twice a week in its switching operations. At 1:38 a. m., the company's employees were pushing a tank car with a switch engine, moving southeasterly toward Sixth Avenue. The track down which the engine and car proceeded was straight for a long distance. The speed, up until a signal board located on the south side of the track about 130 feet west of the street was reached, was six miles per hour. After passing the signal board the engine slowed to one mile per hour. The headlight on the engine did not shine down the track, being obscured by reason of the fact that the tank car was

being pushed ahead of the engine. Four switchmen, as they approached the street, were riding on the footboard on the front end of the tank car. Three of them were equipped with electric lamps which were capable of throwing spot beams of light for 50 to 60 feet down the track ahead of them. There was testimony that the engine bell was ringing, and the engineer testified that he blew the whistle. One of the switchmen testified that no whistle was blown. The company's employees approached the street with the purpose of stopping the engine and car in order to go out upon the street and flag down automobile traffic before crossing the street. All four of the switchmen testified positively that they did not see the plaintiff until his body was under the end of the tank car. When they saw him, the stop signal was given and the engine and car were stopped immediately.

It is the contention of appellant that he was a licensee and that appellees owed him the duty as such. We will take cognizance of two of the assignments of error; namely, "The Court ignored the well-established rule applicable in such cases, that to look is to see" and "That the Court arbitrarily rejected the undisputed evidence that appellees had the last clear chance to avoid injuring appellant." With reference to the other assignments of error we concur in the contentions of appellant that the evidence fairly well discloses that he was lying in or partially in the pathway between the rails of the track. Before attempting to analyze the law applicable to the facts, the following principles of law must be taken into consideration. First, we must determine: Who is a licensee? We quote with approval the following accepted definition: "A licensee is a person who is privileged to enter or remain upon land by virtue of the possessor's consent, whether given by invitation or permission." Restatement of the Law, Torts, vol. 2, § 330. A portion of the comment appearing in subsection (d) under this section reads as follows: "* * * So too, if there be a local custom for possessors of land to permit others to enter it for particular purposes, residents in that locality and others knowing of the custom are justified in regarding a particular possessor as conversant with it and, therefore, in construing his neglect to express his desire not to receive them as a sufficient manifestation of a willingness to admit them. Thus, if it be a custom in a particular town for owners of vacant land to permit persons to cut across it, one doing so is a licensee unless by posted notice or otherwise the particular owner objects to the practice. Familiar intimacy may also justify the assumption of consent to such visits as friends customarily pay to one another."

Secondly: Who is a trespasser? Section 329 of the Restatement of the Law, supra, defines a trespasser as follows: "A trespasser is a person who enters or remains upon land in the possession of an-

·other without a privilege to do so created ʹby the possessor's consent or otherwise."

Section 334 of the Restatement, supra, relates to "Activities Highly Dangerous to ·Constant Trespassers upon Limited Area." It reads as follows: "A possessor of land who knows, or from facts within his ʹknowledge should know, that trespassers ·constantly intrude upon a limited area thereof, is subject to liability for bodily harm there caused to them by his failure to ·carry on an activity involving a risk of ·death or serious bodily harm with reasonable care for their safety."

■■ We do not concur in the contention of appellant that he was a licensee in the manner in which he was using the ʹtracks of the company. Plaintiff did not present any evidence that there was any ʹlocal custom by residents of the neighborʹhood or the general public to use the track for a bed at night. There was no evidence ·that appellees had any actual knowledge ·of such use, nor was there any evidence ·that they should have known or anticipated that the general public made use of their ·tracks for a couch. Appellant was a ʹlicensee as long as he remained upright and used the pathway as a place to walk and ·cross the tracks. When he lay down between the tracks and went to sleep, he ·was a trespasser, and appellees owed him no duty except not to wilfully or wantonly injure him after discovering his peril. 44 Am.Jur., Railroads, § 424. Plaintiff in his ·amended complaint charged wanton negli-

gence. Generally, wilfullness or wantonness of a defendant's conduct is material where it is sought to charge him with liability notwithstanding that plaintiff was a trespasser upon the premises of defendant at the time of the injury for which recovery is sought, or where liability is asserted notwithstanding the contributory negligence of the plaintiff. A plaintiff cannot avoid the consequences of being a trespasser or being guilty of contributory negligence merely by the artifice of pleading wilful or wanton negligence. It is the facts and not the pleadings that are conclusive. We have heretofore approved of the definition of wanton or wilful misconduct as set forth in the Restatement of the Law, Torts, vol. 2, § 500, which section reads as follows: "The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts, which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him." See Womack v. Preach, 63 Ariz. 390, 163 P.2d 280; and Alabam Freight Lines v. Phoenix Bakery, 64 Ariz. 101, 166 P.2d 816.

■ The conduct of defendants in the operation of the switch engine and tank car. was not tainted with any reckless disregard for plaintiff's safety. They had no' reason to anticipate that plaintiff would be

lying unconscious between the tracks. They were not in possession of any facts which would lead them as reasonable men to realize that their manner of operating the train created any unreasonable risk to others or any probability of injuring others. Appellant has called to our attention many railroad cases involving drunk persons who were sitting or sleeping on railroad tracks and suffered injuries or death thereby. Some of these cases hold that the injured person is entitled to recovery as a licensee where defendant was guilty of such acts and conduct as constituted a breach of the care and duty owed to licensees. As above stated, we are of the opinion that appellant was not a licensee, and we believe the correct rule is set forth in the case of Southern R. Co. v. Stewart, 179 Ala. 304, 60 So. 927, 929. The facts involved and the rule appear in the following portion of the opinion: "It is therefore perfectly clear on the undisputed evidence that whether or not defendant's servants were bound to anticipate the presence of pedestrians walking on the track at that point, and hence under the duty of discovering their presence and avoiding doing them injury, they were not bound to anticipate the presence of intestate lying prone between the rails, and were, therefore, under no duty to look out for and discover such presence, and under no duty to avoid injuring him, in the absence of actual and timely knowledge of his presence in that place of danger. In other words, plaintiff's right of recovery must be tested, not by the duty owed to the general public under the conditions named in the complaint, but only by the duty owed to her intestate under the wholly different conditions shown by the evidence."

In Callaway v. Griffin, 245 Ala. 598, 18 So.2d 547, it appeared that the deceased at the time of his death was under the influence of liquor. Numerous pedestrians used the track as a travelway. At the time deceased was injured he was lying or sitting on the track. The court held that he was a trespasser and that the defendant owed him no duty except to exercise reasonable care to avoid injuring him after the discovery of his peril. The court pointed out that even though the defendant's servants were bound to anticipate the presence of pedestrians walking on the track, they were not bound to anticipate the presence of one lying prone between the rails, and that the company was under no duty to look for and discover such presence. Other cases to the same effect are Dickson v. Chattanooga Ry. & Light Co., 6 Cir., 237 F. 352, L.R.A.1917C, 464; Long v. Norfolk & W. R. Co., 222 N.C. 523, 23 S.E.2d 849; Connelly v. Virginian R. Co., 124 W.Va. 254, 20 S.E.2d 885; and Lyons' Adm'r v. Illinois Cent. R. Co., 59 S.W. 507, 22 Ky.Law Rep. 1032.

The appellant, in his use of the roadbed, was nothing more than a trespasser lying on the private right of way of the railroad company, and no use for walking, however open, notorious and constant

by the general public of any path crossing the railroad at that point or any other would entitle appellant to a favored position as a "licensee" slumberer member of such general public. The railroad and its employees owed no duty to appellant except to avoid wantonly, recklessly or wilfully injuring him after actually discovering his presence on the tracks.

In an effort to fasten liability upon the defendants, appellant urges the doctrine of "last clear chance." To sustain this attempt, appellant has further resort to the doctrine of "to look is to see." His proposition is that since the company's employees testified that they were looking ahead at the track as they approached the crossing they must be held to have seen where they looked, and that they cannot be heard to say that they did not see the appellant. In support of this proposition we are cited to the case of Fiddler v. New York Cent. H. R. R. Co., 64 App.Div. 95, 71 N.Y.S. 721, 724. In this case the court, in discussing the testimony of the plaintiff that he looked but did not see, said: "The plaintiff's testimony that he looked but did not see the train, is 'in such contradiction of matters of common knowledge and the laws of nature as to be incredible, as a matter of law.' * * * We think the case at bar falls clearly within the exception pointed out by the learned jurist, to wit, that the statement of the plaintiff that he looked at the approaching engine, which was in plain view, expecting to see it, but that he did not see it, although his eye-sight was good, would shock the sense of a reasonable man, and that no reasonable man could come to but one conclusion, to wit, either that he did not look, or that he did look and did see the approaching train."

Other cases to like effect are Swart v. New York Cent. & H. R. R. Co., 81 App. Div. 402, 80 N.Y.S. 906, 907; Dolfini v. Erie R. Co., 178 N.Y. 1, 70 N.E. 68; and Beck v. Chicago, R. I. & P. R. Co., 327 Mo. 658, 37 S.W.2d 917. Following the reasoning of these cases appellant insists that the defendant employees did see him and having seen him wantonly ran over him, and that regardless of the fact that he might be held to be a trespasser they had the last clear chance to avoid injuring him. We believe that the so-called rule "to look is to see" is a necessary and salutary rule, but it can have no application in the instant case. If plaintiff had been upright and could have been seen clearly by the exercise of reasonable care, we think the rule would apply.

We will next consider appellants' assignment of error "That the court arbitrarily rejected the undisputed evidence that appellees had the last clear chance to avoid injuring appellant." We quote with approval from the Restatement of the Law, Torts, vol. 2, § 479, defining the doctrine of last clear chance. This section reads as follows:

"A plaintiff who has negligently subjected himself to a risk of harm from the

defendant's subsequent negligence may recover for harm caused thereby if, immediately preceding the harm,

"(a) the plaintiff is unable to avoid it by the exercise of reasonable vigilance and care, and

"(b) the defendant

"(i) knows of the plaintiff's situation and realizes the helpless peril involved therein; or

"(ii) knows of the plaintiff's situation and has reason to realize the peril involved therein; or

"(iii) would have discovered the plaintiff's situation and thus had reason to realize the plaintiff's helpless peril had he exercised the vigilance which it was his duty to the plaintiff to exercise, and

"(c) thereafter is negligent in failing to utilize with reasonable care and competence his then existing ability to avoid harming the plaintiff."

The comment on Subclause (iii) reads: "This Subclause has no application unless there is a duty on the part of the defendant to be on the alert to observe the presence of the plaintiff. Thus, a possessor of land is ordinarily entitled to ignore the probability that trespassers may intrude upon his land and is, therefore, under no duty to be on the alert to discover their presence, see Sec. 333. When the plaintiff is a trespasser, therefore, the rule stated in this Clause does not entitle him to recover save in the exceptional situations in which the posses-

sor is required to anticipate the presence of intruders, as to which see Secs. 334 and 335, and 339."

Plaintiff failed to make a prima facie case in that he did not bring himself completely within the rules set forth in § 479 of the Restatement, supra. He did not show that defendants knew of his perilous situation, nor did he show that defendants would have discovered his situation had they exercised the vigilance which it was their duty to exercise. The comment under subsection (iii) states that the subsection relating to "would have discovered the plaintiff's situation" has no application unless there is a duty on the part of defendant to be on the alert to observe and discover the presence of plaintiff.

In reason, and relying on the authorities above cited, we conclude that there was no duty on the part of defendants to anticipate the presence of plaintiff in the position in which he was, and there being no duty to discover such presence plaintiff cannot be heard to say that defendants should have discovered his presence. This conclusion when considered in connection with the positive testimony of the four brakemen that they did not see plaintiff until he was disappearing under the end of the car presents a situation similar to that considered in the case of Seiler v. Whiting, 52 Ariz. 542, 84 P.2d 452, 454, wherein we said:

" * * * As we have stated, the only human being who could testify directly as to the facts immediately before and at the:

time of the collision was the driver of the truck, the defendant J. A. Whiting. The record shows clearly that if his evidence must be accepted by the jury as conclusive on the points concerning which he testified, each and every one of the allegations of negligence were affirmatively disproved. Plaintiff recognizes this is true, and urges that the jury is not required to believe the evidence of an obviously interested party, but may discredit it, and accept rather inferences to be drawn from the physical facts which are shown to have surrounded the accident, and from various presumptions of law and fact. If the physical facts as testified to are of such a nature that it is more reasonable to infer negligence on the part of the defendant Whiting than to the contrary, it is, of course, true that the jury may accept such inference rather than the testimony of an interested witness. (Citing case.) But if these facts are of such a nature that an inference of due care is just as reasonable as one of negligence, the jury may not base a verdict on a guess or surmise that negligence existed.

\*   \*   \*   \*   \*   \*

"When the definite and positive testimony of Whiting is placed on the scale, as we have said any presumptions disappeared, and the burden then shifted to plaintiff to produce some affirmative evidence of negligence which could be weighed by the jury as against the testimony of Whiting, \* \* \*."

In the case at bar the jury was not allowed to base a verdict on guess or surmise that negligence existed. Any inference from physical facts to conflict with positive testimony sufficiently to raise a jury question must point definitely to a lack of care—the testimony in this case points conclusively in the other direction.

The judgment is affirmed.

STANFORD, C. J., and MORGAN, J., concur.