**TEXAS & P. RY. CO. v. UNITED STATES.**
**No. 14287.**

United States Court of Appeals,
Eighth Circuit.

June 13, 1951.

Otto Atchley, Texarkana, Tex. (Atchley & Vance, Texarkana, Tex., on the brief), for appellant.

Leo Meltzer, Attorney, Department of Justice, Washington, D. C. (James M. McInerney, Asst. Atty. Gen., R. S. Wilson, U. S. Atty., Charles A. Beasley, Jr., Asst. U. S. Atty., Fort Smith, Ark., and James O. Tolbert, Attorney, Interstate Commerce Commission, Washington, D. C., on the brief), for appellee.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

The Texas and Pacific Railway Company appeals from a judgment in a civil action brought by the United States under the Safety Appliance Acts, 45 U.S.C.A. §§ 1–16.

So far as material on this appeal the complaint charged the Texas and Pacific with five separate violations of the Acts, committed in hauling five admittedly defective freight cars between two points in the joint freight and terminal yards of Texas and Pacific Railway Company and the Missouri-Pacific Railroad Company in Texarkana, U. S. A., the movement of the cars beginning in Arkansas and ending in Texas. The United States admits that if the movement of cars was in fact by the Missouri-Pacific and not by the Texas and Pacific, as the latter contends, there was no violation of the Safety Appliance Acts by either railroad under the proviso in 45 U.S.C.A. § 13.[1]

The facts were stipulated. Texarkana is the southern terminus of one branch of Missouri-Pacific and the northern terminus of one branch of Texas and Pacific. Greater Texarkana lies in both Arkansas and Texas. The line separating the two States runs through the Union Station and the terminal yards of the railroads. Missouri-Pacific is the owner of all tracks and facilities in the yards in Arkansas, and Texas and Pacific is the owner of all tracks and facilities in the yards in Texas. For many years the terminal yards have been operated as joint yards for the use and benefit of both railroads under an agreement between them. Prior to March 30, 1933, the yards were operated by Missouri-Pacific for the benefit of both railroads, and thereafter under the same contract by Texas and Pacific. On July 1, 1935, the agreement between the railroads for the operation of the yards was changed, and thereafter and at all times pertinent in this case the operation of the yards has been as provided in the new agreement.

Five freight cars with defective appliances were brought into that portion of the freight yards belonging to the Missouri-Pacific by the Missouri-Pacific from some point north of Texarkana. On arrival they were inspected and found to possess the defects charged in the complaint. The necessary repairs were such that they could not be made at the point in the joint yards where the cars were found to be defective. The nearest point on the Missouri-Pacific lines where it maintained for its sole use facilities available for making the repairs necessary was 64 miles north of Texarkana at Gurdon, Arkansas. But, approximately 3,000 feet from the point where the cars were inspected and found to be defective, there were available repair facilities in that portion of the joint yards in Texarkana owned by the Texas and Pacific. The cars were moved from the point of inspection to the repair tracks just mentioned and were there repaired. When they left the repair tracks they contained no defects in violation of any of the requirements of the Safety Appliance Acts.

Under the contract of July 1, 1935, each railroad granted to the other the right to use any and all property and facilities owned by it in the joint yards. In the agreement the component parts of the joint yards were classified as joint freight station facilities, joint coach facilities, joint gas compressing facilities, joint enginehouse facilities, and joint yard facilities. Joint yard facilities were defined as including "Car shops, repair track facilities, material racks, shop machinery, tools and equipment and other facilities appurtenant to the inspection and repairing of cars."

The contract also provided for the operation of the joint yards under the direct supervision of a terminal train master sub-

---

1. "*Provided*, That where any car shall have been properly equipped, as provided in sections 1–16 of this title, and such equipment shall have become defective or insecure while such car was being used by such carrier upon its line of railroad, such car may be hauled from the place where such equipment was first discov-ered to be defective or insecure to the nearest available point where such car can be repaired, without liability for the penalties imposed by this section or section 6 of this title, if such movement is necessary to make such repairs and such repairs cannot be made except at such repair point * * *."

ject to the orders of the superintendent of each of the railroads relating to its business in the joint yards. Mechanical facilities were under the supervision of a general foreman subject to the orders of the master mechanic of each of the railroads relative to its work. No person was permitted to hold the office of terminal train master or general foreman except upon the approval of both the railroads.

The contract fixed the time and manner for the transfer from one railroad to the other of cars or property brought into the joint yards by one railroad for delivery to the other for further transportation. It provided that in the case of a loaded or empty car arriving in the joint yards with a penalty defect which could not be repaired at the point where the defect was discovered, possession of the car and its contents should pass to the receiving railroad only when the necessary repairs had been made on the repair tracks in the joint yards; and that the facilities and equipment, including the railway tracks used in the operation of the joint yards, when being used by one railroad in its work should be deemed the property of that road during the period of such use, and the employees in the joint yards when engaged on the work of either of the railroads should be for the time so engaged employees of the road for which the work was done.

The salaries of the terminal train master, of the general foreman, and of all employees working in the joint yards, including the labor cost of inspection, removing cars to repair tracks, and repairing defective cars, were paid by the Texas and Pacific which was reimbursed by the Missouri-Pacific for its proportion of such costs, the contract providing for the allocation of the costs of operation between the railroads in the ratio that the cars required to be handled by each respectively bore to the total cars handled.

The defective cars were hauled by engines owned by the Texas and Pacific and manned by employees of the joint yards from the point where discovered defective in Arkansas to the joint yard repair tracks in Texas where the necessary repairs were made by joint yard employees.

After finding the facts as stipulated, the court concluded as a matter of law that, since the cars did not become defective while being hauled or used on its line, the Texas and Pacific violated the provisions of the Safety Appliance Acts in hauling the cars from the point of inspection to the repair tracks; and that the contract between the railroads did not vary the absolute mandate of the Acts and had no binding effect upon the Government. The United States interprets the court's findings and conclusions as a finding of fact that the movement of the defective cars was done by the Texas and Pacific. If such was the court's finding of fact, it is clearly erroneous because contrary to all the evidence. On the other hand, if the court concluded as a matter of law, as apparently it did, that the movement of the defective cars was by the Texas and Pacific, the court was wrong. Of course, the contract did not and could not vary the terms of the statute. But we know of nothing in the Safety Appliance Acts which condemns a contract for the joint operation of terminal yards and the use by each road of the facilities owned by the other in such operations where the two roads meet end to end as do the Missouri-Pacific and the Texas and Pacific at Texarkana. The contract for the operation of the joint yards was in the interest of the efficient and economical operation of both railroads. We find nothing in it which conflicts with the letter or the spirit of the Safety Appliance Acts. We hold, as the United States concedes in its brief, that the contract between the roads is valid and binding upon them.

It follows that the joint yard employees who inspected the cars and found them defective, who moved them to the repair tracks, and who repaired the defects were Missouri-Pacific employees; and the facilities, including the engine, the tracks, and the tools used in the operation, were for the time being Missouri-Pacific facilities. The movement of the defective cars was by the Missouri-Pacific "upon its line" within the meaning of the Safety Appliance Acts.

We have found no cases dealing with facts exactly like the facts in this case. Our conclusion, we think, finds support in Philadelphia & R. R. Co. v. United States, 3 Cir., 191 F. 1, and United States v. New York Cent. R. Co., D.C.N.D.N.Y., 70 F. Supp. 761. In both cases it is held that where one railroad under a valid agreement uses the tracks of another for the operation of its trains, the tracks of the second railroad while being used by the first are a part of the first railroad's lines within the meaning of the Safety Appliance Acts. And see also Gray v. Louisville & N. R. Co., D.C.E.D.Tenn., 197 F. 874, 876.

Reversed and remanded to the District Court with directions to dismiss the complaint.