**Percy M. CLARK, Appellant,**

v.

**The ATLANTIC COAST LINE RAILROAD and The Washington Terminal Company, Appellees.**

**No. 13396.**

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 9, 1957.

Decided April 25, 1957.

---

Mr. Ralph F. Berlow, Washington, D. C., with whom Messrs. William T. Hannan, Joseph F. Castiello and Kent D. Thorup, Washington, D. C., were on the brief, for appellant.

Mr. William B. Jones, Washington, D. C., with whom Mr. George E. Hamilton, III, Washington, D. C., was on the brief, for appellees. Mr. George E. Hamilton, Washington, D. C., also entered an appearance for appellees.

Before PRETTYMAN, BASTIAN and BURGER, Circuit Judges.

BASTIAN, Circuit Judge.

Appellant (plaintiff) filed this action in the District Court to recover from the appellees (defendants), Atlantic Coast Line Railroad Company (Atlantic) and Washington Terminal Company (Terminal), for injuries sustained while inspecting brakes of the individual cars making up the train known as the "East Coast Champion." The action was filed under the Safety Appliance Acts and the Federal Employers' Liability Act.[1] After certain intermediate proceedings, on separate motions of the appellees, the District Court granted summary judgments against the appellant and this appeal followed.

1. 45 U.S.C.A. §§ 1, 11, 13, 51 (1952).

The train, of which the railroad car involved in the injury was a part, originated in Miami, Florida. It left that city under locomotive power owned by the Florida East Coast Railroad Company, and was operated by the employees and on the tracks of that railroad until it reached Jacksonville, Florida. From Jacksonville to Richmond, Virginia, it was operated by the locomotive power and the employees of Atlantic over the tracks of that line. On the journey from Richmond to Washington, D. C., the Richmond, Fredericksburg & Potomac Railroad Company (Richmond) furnished the locomotive and the operating crew, and carried the train over its own tracks. When the train arrived at Union Station in Washington, Richmond's engine was uncoupled and removed from the train and the crew of that company left the train. After this and before the train left the station, an engine of the Pennsylvania Railroad was attached to the train. The station is owned, operated and controlled by Terminal, which owns the tracks on which the car in question was standing.

In performance of his duty as a railroad car repairman and as an employee of Terminal, appellant proceeded to inspect the cars to determine if the brakes were in proper operating condition. While acting within the scope of his employment in making this inspection he was injured by reason, it is claimed, of a defective brake.

Appellant alleges that shortly before the time of the injury he had looked at the "billboard" over the top of the car next to the engine and that the "billboard" designated the train as being of Atlantic. He also claims that the pertinent timetable of Atlantic referred to that train as the "East Coast Champion" and represented that Atlantic operated it from Miami to Boston, Massachusetts.[2]

It must be conceded, solely for the purposes of this appeal, that there was a violation of the Safety Appliance Act which was the proximate cause of appellant's injury and that appellant is within the class of persons entitled to the benefit of the Act. The sole defense urged in the District Court and in this court is that neither appellee violated the Act as neither, under the circumstances of this case,* was within the class liable under the Safety Appliance Act.

## I. Liability of Atlantic

The defense of Atlantic is that, insofar as liability under the Safety Appliance Act is concerned, it had no connection with the train after it left Richmond; and Atlantic denies that it hauled, permitted to be hauled, or used on its lines "any car subject to the provisions of said sections."

The facts are conclusive that at the time in question Atlantic was in fact not hauling, permitting to be hauled, or using on its lines the car in question. The liability of a carrier under the Safety Appliance Act is limited in its terms to cases where the carrier hauls, or permits to be hauled, or uses on its lines any car equipped with defective brakes. Patton v. Baltimore & O. R. Co., 3 Cir., 1952, 197 F.2d 732. From an affidavit, not contradicted, filed in connection with the motions for summary judgment, it appears that from the time of the completion of the construction of Union Station and the terminal facilities thereof in the District of Columbia and the beginning of the operation thereof until the present time, Atlantic has never operated railroad trains on or over the tracks of Terminal or into the District of Columbia.

But appellant urges that Atlantic is estopped from denying the use of the car at the time of the injury because of the "billboard" on the car bearing the words "Atlantic Coast Line" and because Atlantic's timetable represented the "East Coast Champion" as being op-

---

2. The timetable indicates that various other carriers play a part in the operation of the train from city to city en route from Miami to Boston, but we treat the representations referred to as unqualified, for the purposes of this decision.

erated by Atlantic from Miami, Florida, to Boston, Massachusetts.

Appellant relies on cases dealing with liability to persons who have been injured while passengers on a common carrier. Such cases have no application here. Appellant was not in any way misled by the "billboard" or the train schedule. It is conceded that he would have inspected the car no matter whose name appeared on the "billboard." It was his duty simply to ascertain whether the brakes were in good working order. If they were not in proper working condition and could be repaired on the track where the car was standing, he would make the repairs. If they could not be repaired while on the track, the car would be hauled to the repair shop of Terminal and repaired there.

There can be no doubt that several elements essential to a case for estoppel are missing. There is no basis for liability on the part of Atlantic in this case and the summary judgment was properly entered as to it.

## II. Liability of Terminal

The facts with relation to Terminal's liability, so far as they appear at the present state of the case, appear from appellant's testimony as to his duties and employment and from the affidavit of the Auditor of Terminal filed in connection with the motions for summary judgment. The relation between Terminal and the carriers is fixed by contract with certain carriers (not including Atlantic) whereby the use and operation of the Washington terminal, including Union Station, the Eckington Car and Engine Yard, and the tracks and appurtenances to the south end of Long Bridge is provided for. From the Auditor's affidavit the following is quoted:

"The interstate railroad companies which enter the District of Columbia and use The Washington Terminal Company property, including the Union Station and tracks, are the Pennsylvania Railroad Company, Baltimore and Ohio Railroad Company, Southern Railway Company, Richmond, Fredericksburg and Potomac Railroad Company and Chesapeake and Ohio Railway Company. Under the October 24, 1907 contract arrangements * * * with The Washington Terminal Company, each of those interstate railroad companies brings its trains into the Union Station in Washington where they are switched, inspected and repaired, when necessary, by The Washington Terminal Company. None of the five mentioned railroad companies operates any facilities in the District of Columbia for the repair of passenger equipment or rolling stock. The switching of cars at The Washington Terminal Company in the course of making up or taking apart trains of the five above-mentioned railroad companies is done by The Washington Terminal Company. In the case of equipment or rolling stock brought into the Union Station by each of the five above-mentioned railroad companies, such equipment or rolling stock is inspected by employees of The Washington Terminal Company for the purpose of determining whether it is in safe operating condition and can be used by one of the other companies in transporting persons or things. In the event that equipment or rolling stock is found to be mechanically defective, it is repaired by The Washington Terminal Company before it is delivered to any of the other companies for use."

Terminal has resisted liability on two grounds:

First, Terminal maintains that it was not "using" the car, but that it was merely inspecting it as the agent of Richmond under a contract arrangement, which bound it to inspect and repair cars delivered by one carrier before hauling or use of the cars by another carrier. Terminal asserts that such an agent is not a common carrier using the defective

car as contemplated by the Safety Appliance Act.

Two cases are cited by Terminal in support of its first contention. The first, Texas & P. Ry. Co. v. United States, 8 Cir., 1951, 189 F.2d 749, involved § 13 of the Safety Appliance Act (see note 1, *supra*), which provides a penalty for hauling, permitting to be hauled, or using on its line any car not equipped with appliances provided in the Act, and the proviso excluding a carrier from liability for the penalty. In the Texas case the lines of two carriers met end to end, at which point the two carriers operated a joint railroad yard for switching and repair purposes, where joint employees did the work, using joint equipment and facilities. One carrier brought on its tracks certain cars with defective safety appliances. The second carrier (the defendant), with an engine owned by it and manned by joint employees, moved the defective cars to the joint repair facility. The court concluded that the movement was not unlawful because the joint employees and facilities should, as provided by the contract between the parties, be regarded as those of the first carrier. Thus, the movement was within the exclusion of liability since the cars were being moved by the first carrier to the nearest repair point on its line. The court made clear that it did not regard it possible to contract away liability; it did not use the term "agent" or "agency" in its decision and made equally clear its reliance on the joint operation and control of the terminal facility.

In the instant case, Terminal has not alleged that it operates the local terminal facilities jointly with the carriers using it. Nor does the contract between Terminal and the carriers (made a part of the record) indicate such a joint operation as the court in Texas relied upon.

The contract involved here is not clear as to whether Terminal is an agent or an independent contractor. So far as the facts in this case appear, there is no joint operation of the terminal. Terminal owns and operates Union Station, its tracks, the switch and repair yards, and its work force is responsible to Terminal.[3] The five carriers, operating through Washington use the local terminal, not because of joint ownership and control but by contract with Terminal, the sole owner and operator of the terminal. For these reasons, under the facts now of record, Texas & P. Ry. Co. does not apply.

The second case relied upon by Terminal is a District Court decision [4] which we believe inapplicable as it is clear that the car there was at all times on the line of the Santa Fe road and not on the Terminal Company's lines.

In United States v. Houston Belt & Terminal Ry. Co., 5 Cir., 1954, 210 F. 2d 421, 424, the defendant had moved cars with a defective appliance to facilitate an interchange. The defendant contended it was not liable for a penalty under § 13 because it was acting as an agent of another carrier. The court there said that the defendant, Terminal Company, could not " * * * claim immunity by reason of some agency claim or contract." We agree with that view. Congress made unlawful certain acts by common carriers by rail. As we believe and hold that Terminal is a carrier within the meaning of the Act, the fact that it might have been acting as an agent pursuant to contract does not excuse or transfer its liability under the Act. Its contract cannot displace the statutory mandate of liability on the carrier that violates the Act. Agency is sometimes the occasion for transferring liability to the principal but it does not

3. An interesting case setting forth the history of the Washington Terminal Company, its organization, its contract with the various railroads entering the District of Columbia, and holding Terminal to be a common carrier within the Federal Employers' Liability Act is McNamara v. Washington Terminal Co., 1911, 37 App. D.C. 384.

4. United States v. Kansas City Terminal Ry. Co., D.C.W.D.Mo.1952, 105 F.Supp. 514.

absolve the agent of the consequences of its unlawful act.[5]

Secondly, Terminal contends that, if it is considered not to be the agent of Richmond, it is not liable because it is a receiving carrier and, as the receiving carrier, it had the right and duty to inspect the train in order to determine whether to accept the train; that, during the period of inspection, including the time of the injury, the defective car remained in the use of the delivery carrier, Richmond; and that, during that period of time, Terminal was not using the car as contemplated by the Act.

Terminal refers us to Brady v. Terminal Railroad Association, 1938, 303 U.S. 10, 58 S.Ct. 426, 82 L.Ed. 614. There the plaintiff was an employee of the Wabash Railroad. He was injured, while inspecting a car to determine if it would be accepted by his employer, as the result of a defective safety appliance which was a violation of the Safety Appliance Act. At the time of the injury, the car was standing on the tracks of Wabash, having been brought there by an engine of the defendant, Terminal Company. The Supreme Court held that the car was still in "use" within the meaning of the Act, and then proceeded to determine whether the receiving carrier, Wabash, was liable. The Court found that, as Wabash was engaged in inspecting the car to determine if it were acceptable, it had not assumed control or responsibility for its condition, and, thus, was not "using" it within the meaning of the statute.

In the instant case, since its employees were engaged in inspecting the car in question after delivery by Richmond, Terminal says that it too is a receiving carrier and not liable. Granting that

Terminal is a receiving carrier and not some other form of contractual intermediary between two or more carriers, the position of Terminal is not analogous to that of Wabash in the Brady case, supra. There, Wabash did not have to accept a car with defective appliances, and had no duty to repair such cars where they stood or in its other facilities. Here, however, it is implicit that Terminal must accept cars with defective appliances and repair them, either where they stand or elsewhere, as circumstances require, all on its own lines.

■ Our view is that the obvious purpose of the Safety Appliance Act is to induce carriers to adhere to higher standards of safety in their operations by imposing a liability on interstate carriers if they do not comply with the Act. Loss occasioned those protected by the Act is to be compensated for at the expense of those whose revenue accrues from their operations as interstate carriers. Terminal is a common carrier [6] covered by the Act. If, in the course of the very activity from which its income is derived, it uses on its lines a car in violation of the Act, it should be as liable to those injured as any other carrier. If it is to enjoy the benefit of engaging in interstate rail transportation, it should bear the same burden imposed upon other carriers who haul, permit to be hauled or use cars on their lines in violation of the Act.

■■ On this appeal the sole issues before this court are whether or not on the present state of the record the defenses of "agency" and/or "receiving carrier" exclude Terminal from liability under 45 U.S.C.A. § 11. Accordingly, our holding is limited to ruling that

---

5. Our rejection of agency as a defense to actions for damages based on violations of the Safety Appliance Act is influenced by the Supreme Court's rejection of agency as a defense for violations of the Hours of Service Act. 34 Stat. 1415, 45 U.S.C.A. §§ 61–66. Denying an agency defense, the Supreme Court has said: "The relation of agency may preclude contractual obligations to the shippers, but it cannot change the obligations of the

carrier concerning the physical operation of the railroad under the Hours of Service Act, which as this court has said, must be liberally construed to secure the safety of employés and the public." United States v. Brooklyn Eastern District Terminal, 1919, 249 U.S. 296, 307, 39 S.Ct. 283, 286, 63 L.Ed. 613.

6. United States v. Brooklyn Eastern District Terminal, note 3, supra.

Terminal's defenses of "agency" and "receiving carrier" are legally insufficient to preclude liability. There appear to us to be genuine issues of material facts as to whether Terminal's specific activities constituted hauling the car or permitting it to be hauled or used on its lines within the meaning of § 11.

We believe this case should proceed to trial and the matter be submitted to a jury to determine, under all the circumstances, whether or not Terminal is liable.

Of course, we express no views as to ultimate liability. Nor do we express any view as to any possible third party liability to Terminal by any other carrier by virtue of contract or otherwise.

The judgment as to Terminal will be reversed.

Affirmed as to Atlantic Coast Line. Reversed as to Washington Terminal Company.