**Jesus TORRES and Esther Fabian de Torres, husband and wife, Plaintiffs,**

**v.**

**SOUTHERN PACIFIC TRANSPORTATION COMPANY, a Delaware Corporation, et al., Defendants.**

**Civ. No. 74–737 PHX (WEC).**

United States District Court, D. Arizona.

March 31, 1977.

G. Michael Jessen and Arthur M. Johnson, Johnson, Tucker, Jessen & Dake, P.A., Phoenix, Ariz., for plaintiffs.

Robert R. Mills, Evans, Kitchel & Jenckes, P.C., Phoenix, Ariz., for defendants.

## OPINION

### FINDINGS OF FACT and
### CONCLUSIONS OF LAW

CRAIG, Chief Judge.

In 1973, plaintiff Jesus Torres, a 28 year old Mexican national, illegally entered the United States for the purpose of seeking employment with the Union Pacific Railroad Company in the state of Idaho. Plaintiff's family, consisting of a wife and four children remained in Mexico. Plaintiff was first employed by the Union Pacific on a temporary basis and was subsequently employed on a permanent basis. Plaintiff's earnings were sent to Mexico for the support of his family.

After working for the Union Pacific for a substantial period of time, plaintiff received advice from his home that his mother was seriously ill. Plaintiff sought and was granted from his employer permission to return to Mexico to visit his mother. He was requested to return to Idaho, following his visit, to continue his employment. Plaintiff returned to Mexico and his family where he remained several weeks until plaintiff's mother recovered sufficiently for plaintiff to return to his employment in Idaho.

Upon this second occasion, plaintiff was accompanied by a friend, Jesus Navarro Orejal, who was also seeking employment. Both plaintiff and his friend entered the United States illegally.

It was the intention of plaintiff and his friend, once they entered the United States south of Yuma, Arizona, to hitch hike to Phoenix and at that point to take a bus to Idaho. This plan of travel was necessitated by a lack of funds. Plaintiff planned to return to his employment, plaintiff's friend hoped to secure employment.

While employed by the Union Pacific in Idaho, plaintiff worked as a track laborer. He lived in a railroad car. He was transported to and from work on railroad cars. During his employment, plaintiff frequently observed people riding in freight trains.

Upon entering the United States, plaintiff and his friend walked for approximately twelve hours without securing an automobile ride. As dawn was breaking on September 8, 1974, plaintiff and his friend had reached a point shortly east of Yuma, Arizona, where they observed defendants' train stopped at a siding designated Fortuna. At this point, the defendants' railroad paralleled the highway. The train was headed in an easterly direction toward Phoenix.

Plaintiff and his friend crossed over to the railroad tracks, walked along the train toward the caboose until they found a car which they could board. They boarded the train. They then concluded to look for a more comfortable car in which to ride. They disembarked, again walked along the train toward the caboose and selected a gondola car loaded with steel ingots. This

car they boarded. In walking along the side of the train, plaintiff and his friend clearly observed the train crew in the caboose. Plaintiff believed that the crew in the caboose observed them equally as well.

From the Fortuna siding, the train upon which plaintiff was riding proceeded easterly a distance of approximately 130 miles to a point a short distance west of Buckeye, Arizona, where the train derailed. The derailment was caused by the failure of a journal on the 9th car ahead or easterly of the car in which plaintiff was riding. Fourteen cars left the tracks in the derailment, 9 cars ahead of plaintiff's car, and 4 cars behind plaintiff's car, as well as plaintiff's car.

The train in question was assembled at West Colton, California. It consisted of 4 locomotives, 65 freight cars, and a caboose. The car in which plaintiff and his companion were riding was the 50th car from the head end of the train or the 15th car ahead of the caboose. The crew of the train consisted of an engineer, a head brakeman, a rear brakeman, and a conductor. The head brakeman rode with the engineer in the lead locomotive. The rear brakeman rode with the conductor in the caboose.

West Colton, California is approximately 200 miles west of Yuma, Arizona. It is customary for the defendant railroad company to perform a "class A" inspection of trains at West Colton. A "class A" inspection includes inspection of journal boxes. There was no evidence adduced at trial that the train in question actually received a "class A" inspection at West Colton. The train in question travelled to Yuma, Arizona, without incident. "Hot box" detectors are maintained by defendant railroad company at various points between West Colton and Yuma. No employee of defendant railroad company reported observing any indication from the "hot box" detectors that there was in fact an overheating journal on the train in question.

At Yuma, Arizona, a new train crew took over the operation of the train in question. The crew again consisted of an engineer, a head brakeman, a rear brakeman and a conductor. At the Yuma yard, it is customary for trains to receive a "class D" inspection. A "class D" inspection consists of a "rolling" inspection to determine whether there is anything dragging under the train or whether there are any visible "hot boxes" apparent. The evidence discloses that a "class D" inspection is simply a visible inspection of the train as it rolls by. No untoward incidents were reported as a result of the "class D" inspection, if any was made.

Upon leaving the Yuma yard for the Fortuna siding, the train in question again passed a "hot box" detector. If that detector was in fact observed by any member of the train crew, no "hot boxes" were reported.

At the Fortuna siding the head brakeman of the train in question dismounted, crossed to the north side of the main line and performed a rolling inspection of the westbound train as it passed. The rear brakeman dismounted and inspected the south side of the train in question covering 15 to 20 cars ahead of the caboose. The conductor dismounted and performed a rolling inspection of the south side of the passing west-bound train.

In the early morning of September 8, 1974, one Gerald Giffin and his two sons left Phoenix on a dove-hunting expedition. Their destination was a point west of Buckeye, a well-known dove-hunting area. As the Giffins passed through Buckeye travelling in a westerly direction, Gerald Giffin observed in the distance quantities of smoke. Giffin first concluded the smoke to be coming from a field fire. As Giffin proceeded west, he observed the train approaching. Giffin also observed that the smoke he had previously seen was in fact emanating from the train. As the train met and passed Giffin, Giffin observed that smoke and flame appeared to be coming from the south side of one of the cars of the train in question. Giffin continued to observe the train in his rear-view mirror and subsequently observed a large flash of dust

emanate from the vicinity of the train. Later in the day Giffin and his sons returned to Phoenix. They passed the derailed train on their return trip and were directed to pass through the area by traffic control officers. It was not until evening on a local television news broadcast that Giffin learned of the magnitude of the derailment. He immediately called the Maricopa County Sheriff's office and reported what he had observed. Approximately five minutes had elapsed from the time Giffin first observed the smoke and the time he saw the flash of dust coming from the train.

Other hunters, including a locomotive engineer, were in a field south of the tracks some 3½ miles west of the derailment. They observed nothing wrong with the train as it passed.

On the journey from Fortuna to the point of derailment, Jesus Navarro was clad in a bright orange shirt. As the train travelled east, the two young Mexicans stood up in the car in which they were riding and waved to passing motorists travelling the highway next to the railroad tracks. As the train approached the point of derailment and for about five minutes or more, prior thereto, Torres and Navarro smelled smoke, then saw it and became apprehensive. With the failure of the journal, the trucks dropped to the tracks and added dust to the smoke. The train continued to travel easterly 1.38 miles after the journal failed and at that point, the train derailed. With the failure of the journal and the dragging of the trucks along the rails and ties, the train and the car in which plaintiff was riding were acting in an exceedingly rough fashion. With the derailment the load of steel ingots in the car in which plaintiff was riding shifted and trapped Torres and Navarro in place. Torres' legs were shattered as were Navarro's. Navarro also apparently received other internal injuries for after several unsuccessful hours of effort to release the two young Mexicans, Navarro died in place. The tank car next to the car in which Torres was riding was loaded with hot asphalt. At the time of the derailment,

the tank car sprung a leak and hot asphalt fell upon Torres to the extent that he suffered major third degree and fourth degree burns. Torres was trapped in place for a period in excess of eleven hours. He did not lose consciousness, subsequently both of Torres' legs were amputated. One just below the hip and the other a few inches further down on the thigh.

Some of the parts of the defective journal were recovered at the scene. One of defendants' inspectors concluded that it appeared from his observations that a "fastburn" caused the failure. The recovered parts were sent to defendants' laboratories at Sacramento, California, for further study and inspection in an effort to determine the cause of the failure. No examination or inspection was performed because the parts were "lost" in transit or at the laboratory.

While a train is in motion, it is the duty of the conductor and brakeman to observe the train and to keep a constant lookout for defects in the train's operation. It is not uncommon for people to frequently "hitch" rides on freight trains. The members of the train crew on the train in question were aware of this practice.

There are numerous curves in the defendants' track in the 130 miles between Fortuna and the point of derailment. Had the train crew in the instant case been alert and had they fulfilled the obligation and duty imposed upon them in their respective positions, by the defendants' safety rules, to continuously observe and to maintain a "vigilant lookout" in the operation of the train, they would have observed two things.

1. They would have observed plaintiff Torres and his companion Navarro riding in the open gondola car.

2. They would have observed the smoke and later the smoke and dust in ample time to have stopped the train prior to the complete failure of the journal and prior to the derailment.

The defendant railroad company, subsequent to the derailment, assessed 60 demerits against the conductor in charge of the

train for his failure to keep a "vigilant lookout" which resulted in the derailment. The 60 demerits were accepted by the conductor. The demerits were subsequently removed by the defendant railroad company.

■ As in many instances, there are no specific Arizona cases on all fours with the facts in the instant case. Under these circumstances, the Supreme Court of Arizona looks to the Restatement of the Law. *Burrell v. Southern Pacific Co.*, 13 Ariz.App. 107, 474 P.2d 466; *MacNeil v. Perkins*, 84 Ariz. 74, 324 P.2d 211; *Ingalls v. Neidlinger*, 70 Ariz. 40, 216 P.2d 387; *State ex rel. Industrial Commission v. Smith*, 6 Ariz.App. 261, 431 P.2d 902, and others.

There are three pertinent sections of the Restatement Second, Torts, to the instant case. They are §§ 334, 336, & 500. These sections read as follows:

"§ 334. Activities Highly Dangerous to Constant Trespassers on Limited Area.

"A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area thereof, is subject to liability for bodily harm there caused to them by his failure to carry on an activity involving a risk of death or serious bodily harm with reasonable care for their safety."

"§ 336. Activities Dangerous to Known Trespassers.

"A possessor of land who knows or has reason to know of the presence of another who is trespassing on the land is subject to liability for physical harm thereafter caused to the trespasser by the possessor's failure to carry on his activities upon the land with reasonable care for the trespasser's safety.

"§ 500. Reckless Disregard of Safety Defined.

"The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."

■ Because a person may be a trespasser does not absolve the owner from acts of negligence of varying degree. The principles embodied in §§ 334 and 336 are discussed in *Denver and Rio Grande Railroad v. Clint*, 10 Cir., 235 F.2d 445, and *James v. AT & SF Ry. Co.*, 10 Cir., 464 F.2d 173. See also *Epling v. United States*, 9 Cir., 453 F.2d 327; *Southern Pacific Co. v. Schuyler*, 227 U.S. 601, 33 S.Ct. 277, 57 L.Ed. 662; *Francis v. Southern Pacific Co.*, 333 U.S. 445, 68 S.Ct. 611, 92 L.Ed. 798.

The Arizona rule appears to be in its simplest form that an owner is expected to use reasonable care under all of the circumstances. It makes no difference "so far as the duty of the railroad company is concerned, whether such persons are technically to be classified as trespassers, licensees, or persons using the company's tracks as of right. In all the cases the duty is imposed because of the broad rule of humanity that one engaged in so dangerous a business is required to exercise ordinary care to avoid injuring another when the presence of and danger to such other person is reasonably to be anticipated. * * *" *Southern Pacific Co. v. Bolen*, 76 Ariz. 317, 327, 264 P.2d 401, 408.

■ The record in this case is silent as to the cause of the journal failure other than in fact the journal failed. The record is also silent as to whether in fact had the "class A" and "class D" inspections been performed (as asserted by defendant, but not proved), the defective journal would have been discovered. Both of these matters were in the exclusive control of defendants. The record is clear that defendants' train crew failed to maintain a "vigilant lookout" or any lookout for the safe operation of the train or the safety of plaintiff Torres and his companion Navarro.

§ 500 of the Restatement Second, supra, defines reckless disregard of safety. It is noted that the definition is frequently called "wanton or willful misconduct". The Arizona courts have discussed the meaning of "gross" or "wanton" negligence. See *Conchin v. El Paso & SWR Co.*, 13 Ariz. 259, 108 P. 260; *Bryan v. Southern Pacific Co.*, 79 Ariz. 253, 286 P.2d 761; *Southern Pacific Transportation Co. v. Lueck*, 111 Ariz. 560, 535 P.2d 599. In the latter case the Arizona Supreme Court said:

> "To determine wanton negligence, the acts of a defendant must be considered as a whole and although each of the several acts standing alone might not exceed the bounds of ordinary negligence, yet taken together they may establish wanton negligence." 535 P.2d at 602; citing *Carley v. Meinke*, 181 Neb. 648, 150 N.W.2d 256. See also, *Western Constructors, Inc. v. Southern Pacific Co.*, 9 Cir., 381 F.2d 573.

In *Bryan, supra*, the Court said:

> "Wanton negligence has been repeatedly defined by this Court. Essentially it involves the creation of an unreasonable risk of bodily harm to another (simple negligence) together with a high degree of probability that substantial harm will result (wantonness)"; 286 P.2d at 762; citing *Southern Pacific v. Baca*, 77 Ariz. 173, 268 P.2d 968; *Scott v. Scott*, 75 Ariz. 116, 252 P.2d 571; *Butane Corporation v. Kirby*, 66 Ariz. 272, 187 P.2d 325; *Barry v. Southern Pacific Co.*, 64 Ariz. 116, 166 P.2d 825; *Womack v. Preach*, 63 Ariz. 390, 163 P.2d 280; *Conchin v. El Paso & S.W.R. Co.*, 13 Ariz. 259, 108 P. 260.

█ The failure of the train crew to keep a vigilant lookout while the train in question was in motion, in violation of defendants' own rules of safety and the failure of the train crew to maintain any lookout adequate to discover plaintiff and his companion, which they should have done and the failure of the train crew to keep any lookout sufficient to discover the difficulties the train was in prior to the derailment within adequate time to stop the train before the disaster took place constitutes gross and wanton negligence and a reckless disregard of the safety of the train and all of its occupants.

█ At the time plaintiff Torres suffered his injuries, he was a healthy person 28 years of age. According to the Commissions 1960 Standard Group Mortality Table published with the Arizona Revised Statutes, Torres had a life expectancy of 42.05 years. Assuming Torres' working ability terminated at age 65, he would have an earning capacity of 37.05 years. Plaintiff's gross earnings in the employment of the Union Pacific were $8,481 per year. Thus, his gross earnings for a 37 year capacity would be $313,797.00. This gross earnings result does not include possible overtime pay, merit pay increases or cost of living increases. The present value of $313,797.00 over a 37 year period discounted at 6% is $120,530.00.

It is speculative as to whether Torres could have corrected his immigration status to allow him to remain in the United States for 37 additional years and thus if he were required to return to Mexico, his earning capability would be reduced. Under the circumstances of this case, it appears that the reasonable value of plaintiff Torres' loss of earnings, based on a present value basis is $100,000.00.

Plaintiff Torres incurred $15,000 in medical and hospital expense. Before Torres is completely stabilized, he will require present and future medical and hospital attention conservatively in the amount of $5000. Plaintiff Torres' pain and suffering under the circumstances of this case were extreme. At the time of trial, Torres was still in pain. He is without two legs for the rest of his life. A reasonable compensation for Torres' pain and suffering and his permanent injuries is one hundred and seventy five thousand dollars ($175,000.00). Judgment may be entered accordingly.

The foregoing Opinion shall constitute the Findings of Fact and Conclusions of Law, pursuant to Rule 52, Federal Rules of Civil Procedure.