Jesus TORRES and Esther Fabian de Torres, husband and wife, Appellees,

v.

SOUTHERN PACIFIC TRANSPORTA-TION COMPANY, a Delaware Corporation, et al., Appellants.

ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a Delaware Corporation, Appellee,

v.

Jesus TORRES and Esther Fabian de Torres, husband and wife, Appellants.

Nos. 77–2701, 75–3165.

United States Court of Appeals, Ninth Circuit.

Oct. 23, 1978.

Rehearing Denied Jan. 26, 1979.

John D. Everroad (argued), of Fennemore, Craig, von Ammon & Udall, Robert R. Mills (argued), Evans, Kitchel & Jenckes, Phoenix, Ariz., for Southern Pac. Transp. Co.

G. Michael Jessen (argued), Johnson, Tucker, Jessen, Dake & Murphy, Phoenix, Ariz., for Torres.

Before BARNES and HUG, Circuit Judges, and CURTIS,* District Judge.

CURTIS, District Judge:

These two appeals arise out of an action brought by Jesus and Esther Fabian de Torres against the Atchison, Topeka and Santa Fe Railway Company and the Southern Pacific Transportation Company for damages for injuries sustained by the plaintiff while riding on a freight car owned by the Santa Fe but on loan to Southern Pacific. The trial judge granted the Santa Fe's motion for summary judgment from which the plaintiff appeals. After a trial, the court awarded a judgment against the Southern Pacific in the sum of $295,000 (*Torres v. Southern Pacific,* reported at 428 F.Supp. 1362 (D.Ariz.1977)), from which said judgment the Southern Pacific appeals. For reasons hereinafter stated, we sustain the summary judgment in favor of Santa Fe and reverse the judgment against Southern Pacific.

## STATEMENT OF FACTS

On September 8, 1974, an hour and a half before sunup, the plaintiff Jesus Torres and his companion Jesus Navarro boarded a freight car which was a part of a sixty-car train then being operated by the Southern Pacific. Both Torres and Navarro were Mexican aliens. They had just illegally entered the United States at the San Luis border and had walked twelve miles on foot, reaching Fortuna, a desolate desert area about ten miles from Yuma. At this point, the defendants' freight train was standing on a siding awaiting clearance on the main track.

After traveling about 130 miles from Fortuna a cement hopper developed a "hot box" (an overheated journal resulting from insufficient lubrication) which ultimately caused the derailment of some fourteen cars including the gondola in which the plaintiff was riding. The resulting impact caused the steel ingots to fall on the two men causing injuries from which Jesus Navarro died, and which resulted in the amputation of both of plaintiff Jesus Torres's legs above the knee. The cement hopper belonged to the Santa Fe, but was on lease to the Southern Pacific under the interchange rules of the American Association of Railroads (A.A.R.).

## TORRES v. SANTA FE—75–3165

The district court granted the Santa Fe's motion for summary judgment without opinion, so that we do not know upon what it based its decision, but it had before it ample grounds for denying the plaintiff relief on claims based both upon negligence and also upon strict liability.

Although the Santa Fe was the owner of the cement hopper which experienced the journal failure, it was not the operator of it at the time of the accident. It is well established that the duty to discover and remedy defects in railroad cars lies primarily with the operating carrier. The A.A.R. rules impose a duty on the part of the operating carrier to inspect the interchange cars at every interchange point, and they relieve the originating carrier of all responsibility for the car once the interchange has been effected. (*See* A.A.R. Rules 1, 89(g)(8).) The applicable regulations of the Interstate Commerce Commission, 49 C.F.R. § 213, *et seq.*, likewise impose the primary inspection obligation on the operating carrier, while the Federal Safety Appliance Act,

* The Honorable Jesse W. Curtis, United States District Judge for the Central District of California, sitting by designation.

45 U.S.C. § 1 (1972), *et seq.* imposes liability for a defective railroad car solely on the carrier operating the car at the time of the accident *See, Chicago, R. I. & P. R. R. v. Chicago & N. W. Ry.,* 280 F.2d 110 (8th Cir. 1960), *cert. denied,* 364 U.S. 931, 81 S.Ct. 378, 5 L.Ed.2d 364 (1961); *Clark v. Atlantic Coast Line R. R.,* 100 U.S.App.D.C. 279, 244 F.2d 368 (1957); *Patton v. Baltimore & O. R. R.,* 197 F.2d 732 (3rd Cir. 1952).

■ This emphasis upon the responsibility of the operating carriers has prompted some courts to relieve the originating carrier of all legal liability once it has surrendered control of the car at the interchange point. *See, Ruiz v. Midland Valley R. R.,* 158 Kan. 524, 148 P.2d 734, 737 (1944); *Demers v. Illinois Cent. R. R.,* 339 Mass. 247, 158 N.E.2d 672, 674 (1959); *Hunter v. Missouri-Kan.-Tex. R. R.,* 276 F.Supp. 936, 940–41 (N.D.Okl.1967), *aff'd,* 433 F.2d 352 (10th Cir. 1970).

In those cases where courts have imposed liability upon the originating carrier, the defect of which the railroad car was subject was of a type which could have been discovered by a reasonably thorough inspection of the car prior to the interchange. *See, e. g., Smith v. Louisville & Nashville R. R.,* 267 F.Supp. 716 (S.D.Ohio 1966); *Avery v. Norfolk & Western Ry.,* 52 F.R.D. 356 (N.D. Ohio 1971); *Huck v. Chicago, S. P., M. & O. Ry.,* 16 Wis.2d 466, 114 N.W.2d 811.

The record before the trial court contains allegations by the Santa Fe that it had made two thorough inspections of the journal boxes on the cement hopper prior to the interchange. The record also contained allegations that the Southern Pacific had made its own independent inspection of the journal boxes on the day of the interchange and no defects were revealed. These allegations were never controverted. Furthermore, it appeared that the undisputed cause of the derailment was the hot box, an operational malfunction of the type which does not give rise to an inference that a detectable defect was present at the point of interchange. In view of the applicable law, and the undisputed facts, summary judgment was appropriate on the issue of negligence.

■ On the issue of strict liability, it is clear that the Santa Fe was not the type of a provider of an allegedly defective product that would be held strictly liable for product defects by the Arizona courts. No Arizona case has been called to our attention which holds a lessor of a chattel strictly liable to a lessee for defects in the chattel. Moreover, it seems clear that even in those jurisdictions which do recognize some lease-relationships as a basis for the application of the doctrine of strict liability, the highly specialized industry-use interchange program to be found in this case is too dissimilar to the commercial distribution of a product to warrant the doctrine's application.

The summary judgment in favor of the Santa Fe Railroad is therefore affirmed.

## TORRES v. SOUTHERN PACIFIC—77–2701

■ In this appeal, the appellant Southern Pacific contends that the trial court has imposed upon it a duty toward trespassers beyond that which the law allows. We agree.

Since Torres at no time sought or received any permission to board or ride the freight train, he and his companion were clearly trespassers, and no contention is being made to the contrary.

There is no evidence that any member of the train crew saw either of the men prior to the accident, although no effort was made by the hitchhikers to hide. They rode in an open gondola on top of a load of steel ingots. Navarro wore a bright orange shirt, and both men waved from time to time to passersby on the highway.

In awarding judgment for Torres, the trial court held that had the train crew maintained a "vigilant lookout" they would have observed (1) the presence of Torres and his companion, and (2) the dust and smoke resulting from the hot box in time to have prevented the derailment.

Two questions are raised by this appeal. (1) Does the railroad owe a duty to trespassers to maintain some inspection proce-

dure to determine their presence, and (2) does it owe a duty to trespassers to maintain a "vigilant lookout" to protect them from operational malfunction of the equipment. In our view, these questions should be answered in the negative.

In the first place, we think the trial court too readily abandoned applicable Arizona cases in this area, because they did not in all respects fit the facts here. Nonetheless, we perceive no conflict here between the applicable Arizona case law and the Restatement of Torts (2nd) sections upon which the trial court relied. *See, Bisnett v. Mowder,* 114 Ariz. 213, 215, 560 P.2d 68, 69–70 (1977); *Barry v. Southern Pacific Co.,* 64 Ariz. 116, 166 P.2d 825, 829 (1946). In the *Barry* case, the court acknowledged the general rule that the occupier of land owes no duty toward a trespasser except not to wilfully and wantonly injure him after discovering his peril.

This general rule has been carried over in the Restatement of Torts (2nd) § 333 which reads:

"Except as stated in §§ 334–339, a possessor of land is not liable to trespassers for physical harm caused by his failure to exercise reasonable care

(a) to put the land in a condition reasonably safe for their reception, or

(b) to carry on his activities so as not to endanger them."

An exception to this general rule has developed in cases where one is carrying on an activity dangerous to life and limb in a limited area where trespassers are known to constantly intrude. As applied to railroads, this exception deals with the so called "pathway cases". *See, Barry v. Southern Pacific, supra,* 166 P.2d at 827–28, and *Southern Pac. Co. v. Bolen,* 76 Ariz. 317, 264 P.2d 401. This exception is covered by section 334 of the Restatement of Torts (2nd) and provides:

"A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area thereof, is subject to liability for bodily harm there caused to them by his failure to carry on an activity involving a risk of death or serious bodily harm with reasonable care for their safety."

Section 334 is not properly applicable to the facts before us. No member of the Southern Pacific had actual knowledge of plaintiff's presence, and there is no evidence that any member of the crew had knowledge that trespassers were constantly intruding upon a limited area. There is no indication in the record that anyone has ever hitched a ride on this particular car before, nor that any trespasser had at any previous occasion boarded any freight car at or near this precise location.

The trial court apparently relied upon the finding that "it is not uncommon for people to frequently 'hitch' rides on freight trains. The members of the crew of the train in question were aware of this practice." The record reveals no further facts within the knowledge of the train crew which would cause them to suspect the presence of Torres and his companion. This is not sufficient, as noted in the comments of section 334 of the Restatement:

"d. In order that the possessor of land may be subject to liability under the rule stated in this Section, it is necessary that he know, or from facts within his knowledge should know, that persons constantly and persistently intrude upon some particular place within the land. *It is not enough that he know or have reason to know that persons persistently roam at large over his land."* (Emphasis added.)

The trial court also relied upon section 336 of the Restatement which provides:

"A possessor of land who knows or has reason to know of the presence of another who is trespassing on the land is subject to liability for physical harm thereafter caused to the trespasser by the possessor's failure to carry on his activities upon the land with reasonable care for the trespasser's safety."

In our opinion this section is not applicable to the facts in this case. As stated in the Restatement comment under this section:

"a. The rule stated in this Section applies to determine the liability of a possessor of land from harm legally caused to a trespasser by the manner in which the possessor carries on his activity *after he knows,* or *has reason to know,* that the trespasser is upon his land and is likely to be harmed unless the activities are carefully carried on." (Emphasis added.)

As we have previously pointed out, no member of the crew actually knew of Torres's presence, nor were they in possession of facts which constituted a "reason to know of the presence" of Torres. Furthermore, typical illustrations of the applicability of this section seems to involve affirmative action, which if negligently carried on may cause serious injury as an immediate and direct consequence, such as starting or stopping trains, giving or failing to give a signal by bell or whistle. This is far different from passive negligence, such as a failure to keep a constant, vigilant lookout, or a failure to carry out a routine inspection at a time when no peril is foreseeable.

The thrust of the trial court's opinion appears in this quotation:

"The Arizona rule appears to be in its simplest form that an owner is expected to use reasonable care under all of the circumstances. It makes no difference 'so far as the duty of the railroad company is concerned, whether such persons are technically to be classified as trespassers, licensees, or persons using the company's tracks as of right. In all the cases the duty is imposed because of the broad rule of humanity that one engaged in so dangerous a business is required to exercise ordinary care to avoid injuring another when the presence of and danger to such other persons is reasonably to be anticipated. * * *' *Southern Pacific Co. v. Bolen,* 76 Ariz. 317, 327, 264 P.2d 401, 408." 428 F.Supp. at 1366.

This quotation must be taken in the context in which it was used in *Bolen.* There the court was speaking of the typical pathway type case, where the train crew either knew, or had reason to know, that trespassers were *constantly* and *persistently* intruding upon some *particular* and *limited* area.

We conclude therefore that under the facts of this case, the train crew had no duty to search or anticipate the presence of Torres, nor did they owe any duty to Torres to either periodically or continually maintain a vigilant lookout for any operational malfunction of the train.

REVERSED.