TOLEDO, PEORIA & WESTERN RAILROAD, Plaintiff-Appellee, *v.* BURLINGTON NORTHERN, INC., Defendant-Appellant.

Third District   No. 77-506

Opinion filed December 29, 1978.—Modified on denial of rehearing February 14, 1979.

Davis & Morgan, of Peoria, and Theodore G. Schuster, of Burlington Northern, Inc., of Chicago, for appellant.

Cornelius P. Callahan, of Lord, Bissell & Brook, of Chicago, and John E. Cassidy, Sr., of Cassidy, Cassidy & Mueller, of Peoria, for appellee.

James P. Daley, of Chicago, and E. Parker Brown, II, of Association of American Railroads, of Washington, D. C., for *amicus curiae* Association of American Railroads.

Mr. JUSTICE STENGEL delivered the opinion of the court:

Defendant Burlington Northern, Inc., brings this appeal from a judgment for $1,787,500 entered in favor of plaintiff, Toledo, Peoria & Western Railroad, in a product liability action arising out of a 1970 train

derailment which caused numerous explosions and extensive damage at Crescent City, Illinois.

After the catastrophic accident, investigators determined that the derailment occurred when a "hot box" caused a wheel to come off a hopper car identified as car CB&Q 182544 and owned by Chicago, Burlington & Quincy Railroad, a predecessor to defendant Burlington Northern, Inc. In 1946 CB&Q manufactured the 70-ton covered hopper car involved here and equipped it with solid or friction bearings.

The solid bearing assemblies used on railroad cars are composed of the journal, which is the machined end of the axle; a 50-pound bearing positioned over the journal, the wedge, which is located over the bearing to control upward movement; the lubricator pad, which transmits oil to the journal and bearing; and the journal box which encloses all components and also contains the lubricating oil. In operation the journal and axle turn with the wheels and draw oil through the lubricator pad to form a film between the journal and the bearing. Proper function of a solid bearing assembly requires an adequate supply of lubrication, proper positioning of components, and the absence of contaminants. The components can be inspected by opening the journal box lid.

Roller bearings were first developed about 1949 and since 1958 have been used exclusively on all new cars built by CB&Q and later by Burlington. A roller bearing assembly is composed of a journal and a collar consisting of two circular races in which the roller bearings turn. Roller bearing assemblies are sealed units that cannot be viewed on inspection, and they require annual lubrication.

A "hot box" is a fire in a journal box caused by excessive friction. Hot boxes occur with more frequency where solid bearings are used than with roller bearings. The Association of American Railroads has adopted an Interchange Rule which imposes the primary responsibility for inspection and lubrication of all freight cars upon the railroad to which a car has been interchanged. Both plaintiff and defendant had agreed to be bound by the AAR Interchange Rules prior to the accident.

In 1969 the hopper car involved here underwent scheduled maintenance at defendant's plant in Havelock, Nebraska. The solid bearing assemblies were replaced with a new solid bearing assembly, some components of an improved design were added, and the car was given a new number (CB&Q 182544). At that time, it was technologically possible to convert solid bearings to roller bearings, and in fact the Rules of the Association of American Railroads required rebuilt 100-ton cars to be so converted. The Rules also required all new cars to be equipped with roller bearings. However, a 70-ton car like this one was in full compliance with solid bearings. After being rebuilt and prior to the accident at

Crescent City, car CB&Q 182544 experienced three bearing failures, but none of these involved the bearing at the L4 wheel position.

On June 20, 1970, car CB&Q 182544 was received by plaintiff railroad at its East Peoria yard, and all the journals were inspected by plaintiff's employees. During the early morning hours of June 21, this car was incorporated into train 20 which was made up of 103 loaded freight cars, 5 empties, 1 caboose, and 4 locomotives. After leaving East Peoria at 3:25 a.m., train 20 proceeded eastward toward its destination at Effner, Indiana. Along the route the four members of the train crew, two of whom rode in the locomotive and two in the caboose, visually inspected the train as it went around curves.

During 1970 plaintiff operated all its trains in accordance with certain rules which required all employees to be constantly on the lookout for hot boxes and for signals from railroaders and the general public. The members of the crew of train 20 insist that they repeatedly watched for smoke or flames during the trip. Railroad employees at Forrest and at Weston, Illinois, gave the crew of train 20 a "highball" sign indicating that everything was in order. Crew members saw a similar "highball" signal given by an Illinois Central operator at Gilman, Illinois, which is only a few miles from the scene of the accident; however, one-half block east of the Gilman depot, a man waiting to cross the tracks saw flames shooting out from the wheel of a car on the north side of the train but he was unable to give a warning. Another man waiting for the train to pass the Route 45 crossing on the east edge of Gilman also saw a flaming hot box on a front wheel of a hopper car. He tried to signal to a crewman in the caboose, but the crewman did not appear to see him. The train hauled car 182544 another eight miles until the journal and bearing on the L4 wheel burned off, the side frame dropped to the track, and finally the entire car bounced into the air at the Route 49 crossing on the west edge of Crescent City. The lead wheels came down off the track and ran on the ties about 1,000 feet, causing the general derailment which followed. At that point the train automatically went into an emergency stop. A tank car filled with liquid propane gas exploded almost at once followed later by additional explosions which caused numerous fires and inflicted severe damage to persons and property in Crescent City. Plaintiff eventually settled all damage claims for a total of $1,755,400 and also expended $32,000 for damage to its own track and equipment.

In this product liability action against defendant, plaintiff seeks to recover in tort, under count I on a theory of strict liability and, under count II on a theory of negligence, for the rebuilding of car CB&Q 182544 in an unreasonably dangerous and defective condition.

At the trial by jury plaintiff did not adduce evidence of any

manufacturing or physical defect in the bearing assembly of car CB&Q 182544, but did introduce evidence relating to the general risks or dangers of hot boxes occurring when solid bearings are used. The jury was instructed that the issue under count I was whether, at the time the car left the control of defendant after being rebuilt, there existed a condition which rendered the car unreasonably dangerous in that it was equipped with solid bearings rather than with roller bearings. The issue under count II was stated to be whether defendant was negligent in failing to equip the car with roller bearings in 1969. The jury was also instructed as to defendant's affirmative defenses to count I based on misuse and assumption of the risk.

Motions for directed verdicts filed by both parties were denied by the court, and after the case was submitted to the jury, verdicts were returned in favor of plaintiff as to both count I and count II. Damages were assessed at $1,787,491.05. In response to two special interrogatories the jury found that defendant did "rebuild" car CB&Q 182544 in 1969, thus rejecting defendant's argument that the car was merely repaired, and the jury found that plaintiff was not guilty of contributory negligence. After the trial court denied defendant's post-trial motion, this appeal followed.

Defendant has raised a multiplicity of issues, but because we conclude that judgment should have been entered for defendant as a matter of law, we shall discuss only those issues necessary to our decision.

■■■ Illinois first recognized strict liability in tort for defective products in 1965 and has generally adopted the elements of a strict liability action set out in Restatement (Second) of Torts §402A (1965). Plaintiff must prove that an unreasonably dangerous condition existed in a product at the time the product left the control of the seller or the manufacturer and that the condition was the proximate cause of plaintiff's injury or damage. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182.) As is noted in comment *g* of the Restatement, a defective condition is a "condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." (Restatement (Second) of Torts §402A, comment *g*, at 351 (1965); *Dunham v. Vaughan & Bushnell Mfg. Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401.) The justification for imposing strict liability is that the public interest in human life and health demands the protection of law against the sale of defective products. Since the seller and the manufacturer solicit and invite use of a product by advertising, any losses to the user should be borne by those who created the risk and reaped the profit by placing the product in the stream of commerce. *Suvada.*

■■ Under count I of the complaint, plaintiff asserted that solid bearings

were unreasonably dangerous on this 70-ton hopper car, considering the risk of hot boxes and the availability of roller bearings, and therefore that defendant should be held strictly liable for damages which were caused by the bearing failure. Thus plaintiff, a railroad user of car CB&Q 182544, is seeking to recover from defendant, a railroad rebuilder of the car, for damages resulting from a derailment caused by an undetected hot box in the bearing assembly on one of the car's wheels. At trial there was ample evidence that plaintiff knew full well the risks and dangers of transporting freight cars equipped with solid bearings and that plaintiff, through its employees, repeatedly inspected all its trains, including train 20, for just such a hot box occurrence. Plaintiff admitted that it owned and operated cars with solid bearings and was still using such cars at the time of trial, six years after the accident. Plaintiff's vice-president in charge of operations testified that company rules required employees to be constantly on the lookout for hot boxes and for distress signals from bystanders. Furthermore the alleged defect here was not a concealed physical flaw but purely a matter of design known to plaintiff when the car was accepted for interchange.

In a strict liability action brought in federal court by a railroad against the manufacturer of a wheel which failed in use, causing a derailment with resulting damages of $745,000, the trial court denied recovery and found that the plaintiff railroad "fully contemplated all the characteristics of the wheel in question and that the wheel was neither defective nor unreasonably dangerous." (*St. Louis-San Francisco Ry. Co. v. Armco Steel Corp.* (E.D. Mo. 1973), 359 F. Supp. 760, 762.) On appeal the United States Court of Appeals for the Eighth Circuit affirmed, commenting that plaintiff was not in the position of "an unwary railway passenger," and that plaintiff's employees regularly inspected wheels for cracks caused by metal fatigue. (*St. Louis-San Francisco Ry. Co. v. Armco Steel Corp.* (8th Cir. 1974), 490 F.2d 367, *cert. denied* (1974), 417 U.S. 969, 41 L. Ed. 2d 1140, 94 S. Ct. 3173.) The court also observed:

> "[Plaintiff] is, in effect, urging this Court to go beyond the doctrine of strict liability and hold that [defendant] is an insurer and, thus, responsible in damages to a railway company whenever one of its wheels fails. We respond negatively to the urging." 490 F.2d 367, 370.

Similarly we think plaintiff in the case at bar seeks to hold defendant responsible as an insurer for any damages resulting from a bearing failure on one of its rebuilt cars. Not only would such a result do violence to the theory underlying strict liability, but it would also fly in the face of the contractual duty undertaken by plaintiff when it agreed to be bound by the A.A.R. Interchange Rules that required plaintiff to inspect, lubricate, and be responsible for the condition of all cars on its line.

Plaintiff argues that defendant has erroneously sought to equate plaintiff's position with that of a purchaser who furnishes design specifications to a manufacturer when in fact plaintiff did not "choose" the solid bearing design utilized by defendant. Plaintiff also says that it should not be bound by A.A.R. standards because it was not a voting member of the Association in 1970. Plaintiff overlooks the fact it voluntarily agreed to "abide by the Code of Rules governing the *condition of, repairs to,* and settlement for freight cars for the interchange of traffic as formulated by * * *" the A.A.R. Also plaintiff was a voting member of the Association until September 1, 1968, and the bearing standards were adopted prior to that date.

We conclude therefore that, as a matter of law, the design of car CB&Q 182544 did not create a condition that was unreasonably dangerous to plaintiff, and on the basis of the undisputed facts in the record, it was error to submit this case to the jury.

■ We believe a reversal is also necessary because the evidence shows that, as a matter of law, plaintiff assumed the risk of danger by accepting the car in interchange with full knowledge of the hazards involved. The Supreme Court of Illinois has stated that, in product liability actions, assumption of the risk is a bar to recovery "if the plaintiff is aware of the product defect and voluntarily proceeds in disregard of the known danger." (*Court v. Grzelinski* (1978), 72 Ill. 2d 141, 149, 379 N.E.2d 281, 284; *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305.) In *Prince v. Galis Manufacturing Co.* (3d Dist. 1978), 58 Ill. App. 3d 1056, 374 N.E.2d 1318, a coal miner, who used a roof bolting machine without a wrench retainer after being warned of the danger, was injured when the wrench flew out of the machine and struck him in the face. This court ruled that the defense of assumption of the risk was established as a matter of law, thus barring recovery under a strict liability theory. Accord, *Fore v. Vermeer Manufacturing Co.* (3d Dist. 1972), 7 Ill. App. 3d 346, 287 N.E.2d 526.

In the case at bar, the testimony of plaintiff's own witnesses is clear and uncontradicted that plaintiff was fully aware of the hazard of a hot box occurring on cars equipped with solid bearings. Plaintiff owned 550 cars with solid bearings in 1970 and had considerable experience with hot boxes. Furthermore, prior to June 21, 1970, plaintiff had determined that a hot box detection device should be installed on the track at a point just west of Gilman, and after the accident did install one at that location. Assumption of the risk is a matter of law where, as here, the facts are undisputed and reasonable men would not differ as to the conclusion to be drawn. *Fore v. Vermeer Manufacturing Co.* (3d Dist. 1972), 7 Ill. App. 3d 346, 287 N.E.2d 526; 65A C.J.S. *Negligence* §251(2) (1966).

On the basis of the record, we believe plaintiff is barred from

recovery, under strict liability by its assumption of the risk when it undertook to transport car CB&Q 182544 with knowledge of its solid bearings and the attendant dangers. Having assumed the risk, plaintiff must bear the loss.

■■ The jury also returned a verdict for plaintiff under count II which alleged defendant's negligence in rebuilding the hopper car in an unreasonably dangerous and defective condition. As our previous discussion of the evidence indicates, there was no basis for a finding of negligence since the bearing was not physically defective and the design was not unreasonably dangerous but was customarily used within the industry. The fact that some other design might conceivably be safer is not proof of negligence. (*Watts v. Bacon & Van Buskirk Glass Co.* (1959), 18 Ill. 2d 226, 163 N.E.2d 425.) Therefore we hold that, as a matter of law, defendant was not negligent, and the judgment must be reversed.

The defendant has submitted as additional authority several recent product liability decisions, including *Crowe v. Public Building Com.* (1978), 74 Ill. 2d 10, 383 N.E.2d 951; *Hunt v. Blasius* (1978), 74 Ill. 2d 203, 384 N.E.2d 368; *Sipari v. Villa Olivia Country Club* (1st Dist. 1978), 63 Ill. App. 3d 985, 380 N.E.2d 819. We have also noted a tank car explosion case where recovery was allowed and was based upon a theory of strict liability because of a defective design. (*Rucker v. Norfolk & Western Ry. Co.* (5th Dist. 1978), 64 Ill. App. 3d 770, 381 N.E.2d 715.) All of these cases are generally distinguishable from the case at bar because in all of them the plaintiff is either an employee or a member of the general public while in the instant case plaintiff is a railroad with the same expertise and knowledge of the characteristics of solid bearings as defendant. We find more helpful the observation of the court in the recent case of *Torres v. Southern Pacific Transportation Co.* (9th Cir. 1978), 584 F.2d 900, that the interchange of railroad cars is a highly specialized industry use which is too dissimilar to the commercial distribution of a product to warrant application of the doctrine of strict liability. In *Torres,* the reviewing court affirmed a summary judgment in favor of the railroad-owner of a freight car which developed a hot box while being operated by another railroad. In the resulting derailment two trespassers riding on another car were injured.

Accordingly, we reverse the judgment of the Circuit Court of Peoria County.

Reversed.

SCOTT, P. J., and STOUDER, J., concur.