**Ralph and Sandra PIERCE, Plaintiffs,**

v.

**BURLINGTON NORTHERN RAILROAD COMPANY, a corporation, Defendant,**

**BURLINGTON NORTHERN RAILROAD COMPANY, a corporation, Third Party Plaintiff,**

v.

**CONSOLIDATED RAIL CORPORATION, Third Party Defendant.**

No. 86–1086.

United States District Court, C.D. Illinois, Peoria Division.

June 11, 1987.

Herbert Stride, Chicago, Ill., for plaintiffs.

John Newell, Chicago, Ill., for Burlington Northern.

Daniel Johns, Peoria, Ill., and Alvin Domash, Chicago, Ill., for Consolidated Rail.

## MEMORANDUM AND ORDER

MIHM, District Judge.

On January 25, 1985, a Burlington Northern freight train derailed as it was moving

through Colmar, Illinois. The derailing cars struck a pick-up truck that was stopped at a crossing waiting for the train to pass. The Plaintiff, Ralph Pierce, was a passenger in the pick-up truck and was injured in the incident. Pierce and his wife sued the Burlington Northern for his injuries, and recently added Conrail (by leave of Court) as an additional Defendant on claims of negligence. The Court has jurisdiction over this matter on the basis of the diversity of the parties, 28 U.S.C. § 1332.

Burlington Northern filed a third-party action against Conrail for contribution (Count I) and for damages to the Burlington Northern's own property (Count II). In this third-party action, Burlington Northern alleges that the derailment was caused by a defect in one of the freight cars on the train, which car was owned by Conrail. The third-party action alleges that the defective freight car was not properly inspected or maintained by Conrail and that Conrail failed to warn Burlington Northern of the defect in the car. This case is presently before the Court upon the Motion of the Third–Party Defendant, Consolidated Rail Corporation, for summary judgment.

Without differentiating between the two counts in the Third–Party Complaint, Consolidated Rail, the owner of the freight car, filed this Motion for Summary Judgment on the grounds that the American Association of Railroads (AAR) Interchange Rules assign the responsibility for the condition of the freight cars on the using carrier, in this instance, Burlington Northern. The crux of Conrail's argument is Rule No. 1 of the AAR Interchange Rules, which provides:

"1. CARE OF FOREIGN FREIGHT CARS.

Rule 1.(a) Each railroad is responsible for the condition of all cars on its line, and must give to all equal care as to inspection and lubrication."

According to Conrail, the AAR Interchange Rules allocate responsibility between railroads who use each other's railroad equipment. Because Burlington Northern accepted the freight car in interchange on January 23, 1985, after having an opportu-

nity to inspect it, this Court should not allow Burlington to impose responsibility for any loss due to a defect in the car upon Conrail, who did not have an opportunity to inspect or maintain the railroad car after the January 23, 1985 interchange date. In support of this position, Conrail relies upon the cases of *Toledo, Peoria & Western Railroad v. Burlington Northern, Inc.*, 67 Ill.App.3d 928, 24 Ill.Dec. 796, 385 N.E.2d 937 (3rd Dist.1979) and *Torres v. Southern Pacific Transportation Co.*, 584 F.2d 900 (9th Cir.1978).

Burlington Northern responds by arguing that Conrail's reliance upon the *Toledo* case is misplaced, since the actual holding of that case was that the owner railroad was not liable in strict liability or negligence because the alleged defect in the design of the railroad car was not, as a matter of law, an unreasonably dangerous condition. Burlington Northern also argues that the AAR rules are not a contractual bar to the maintenance of the contribution action between the railroads, and the Court should not read the rules as nullifying the terms of the Illinois Contribution Among Joint Tortfeasors Act, Ill.Rev.Stat., ch. 70, § 301 *et seq.*

The issue involved in this Motion for Summary Judgment is whether Burlington can maintain either one or both of its claims against Conrail in light of the fact that both parties are signatories to the AAR Interchange Rules. It is difficult to ascertain the exact application of these rules.

General Rule A reads:

"1. These rules are formulated ... as a guide to the fair and proper handling of all matters contained therein for the interchange of freight traffic, with the intent of:

(a) Making car owners responsible for and therefore chargeable with the repairs to their cars necessitated by ordinary wear and tear and fair service, Safety requirements and by the Standards of the Association of American Railroads.

(b) Placing responsibility with and providing a means of settlement for damage

to any car, occurring through unfair usage or improper protection by the handling company.

(c) Providing an equitable basis for charging such repair and damages.

    * * * "

Rule 1 then goes on to state:

"Care of Freight Cars.

1. Inspection.

    A. Each railroad is responsible for the condition of all cars on its lines."

Rule 89 discusses the conditions governing delivery and acceptance of cars involved in an interchange, and Rules 95 and 96 discuss the responsibilities of the handling and/or delivering line and car owner, respectively.

Although neither of the parties discuss the specific application of these rules to the situation before the Court, it seems clear from a reading of these rules that they are generally concerned with the condition and damage to the actual railroad car which is involved in the interchange. In the present lawsuit, the claims by Burlington against Conrail involve contribution for personal injuries to a bystander (Count I) and damage to property of the Burlington Northern Railroad (Count II). Therefore, the Court does not agree with Conrail's arguments that these rules are the definitive word on the allocation of responsibility between railroads who use each other's railroad equipment.

The case law on this issue is not particularly helpful. The case upon which Conrail most heavily relies is *Toledo, Peoria & Western Railroad v. Burlington Northern,* 67 Ill.App.3d 928, 24 Ill.Dec. 795, 385 N.E.2d 937 (3rd Dist.1978). The plaintiff in *Toledo,* the Toledo, Peoria & Western Railroad, brought a product liability action against the defendant, Burlington Northern, for a 1970 train derailment incident which caused extensive damage at Crescent City, Illinois. The derailment occurred when a "hot box" (fire in a journal box) caused a wheel to come off a hopper car which was owned by the Burlington Northern and was being operated by the Toledo Railroad. Prior to this lawsuit, Toledo Railroad had settled all damage claims and paid for damage to its own track and equipment, and then it brought the product liability action against the Burlington Northern on theories of strict liability and negligence. The essence of the plaintiff's claims was that the car involved in the derailment was equipped with solid bearings, and hot boxes occur more frequently where solid bearings are used than with roller bearings. The Toledo Railroad claimed that the Burlington Northern's use of the solid bearings rather than converting them to the safer roller bearings was negligent and rendered the car unreasonably dangerous. The Appellate Court held that the design of the bearings on the railroad car did not create a condition that was unreasonably dangerous, nor was there any basis for a finding of negligence "since the bearing was not physically defective and the design was not unreasonably dangerous but was customarily used within the industry." 24 Ill.Dec. at 801, 385 N.E.2d 937.

In the course of its opinion, the Court made reference to the AAR Interchange Rules, pointing out that the car was in full compliance with the rules, even though the Interchange Rules required larger cars to be converted to roller bearings and all new cars to be equipped with roller bearings. The Court explained that the plaintiff's strict liability count, in effect, sought to hold Burlington Northern responsible as an insurer for any damages resulting from a bearing failure on one of its cars. The Court stated:

"Not only would such a result do violence to the theory underlying strict liability, but it would also fly in the face of the contractual duty undertaken by plaintiff when it agreed to be bound by the A.A.R. Interchange Rules that require plaintiff to inspect, lubricate, and be responsible for the condition of all cars on its line." *Id.* at 800, 385 N.E.2d 937.

Finally, the Court cited with approval the case of *Torres v. Southern Pacific Transportation Co.,* 584 F.2d 900 (9th Cir.1978). The Illinois Court explained the result in *Torres* by saying, "[T]he interchange of railroad cars is a highly specialized indus-

try use which is too dissimilar to the commercial distribution of a product to warrant application of the doctrine of strict liability." *Id.* 24 Ill.Dec. at 801, 385 N.E.2d 937. The Court also distinguished numerous product liability cases against railroads on the grounds that those cases involved plaintiffs who were either employees or members of the public, while the case before the Court involved a railroad that had the same knowledge of the workings and dangers of solid bearings as the defendant railroad.

In *Philips Petroleum Company v. Norfolk & Western Railway Company*, 96 Ill. App.3d 1093, 52 Ill.Dec. 457, 422 N.E.2d 138 (4th Dist.1981), the Illinois Appellate Court discussed the holding in *Toledo* and ruled that the Norfolk & Western, the railway operating the interchange, could not maintain product liability claims against the manufacturer/lessor and lessee of a tank car which exploded. The Court noted that the Norfolk & Western Railway was a member of the Association of American Railroads, and that the design for the tanker car which exploded met the standards of the AAR. The Court explained:

"As a matter of law, a railroad has no right to product liability relief against the manufacturer of a railroad car on the basis of an unreasonably dangerous design where the design used met the standards of the Association of American Railroads (AAR) to which the plaintiff railroad belonged." 52 Ill.Dec. at 461, 422 N.E.2d at 142.

The Court also added that it would be improper to allow the product liability claim when the subsequent user of the allegedly defective railroad car was a railroad corporation which participated in the development of specifications for the construction of the railroad car and is chargeable with the same expertise and knowledge of the characteristics of the car construction as the manufacturer of the car. The Court made this statement to distinguish the case from that of *Rucker v. Norfolk and Western Railway Co.*, 77 Ill.2d 434, 33 Ill.Dec. 145, 396 N.E.2d 534 (1979), where an employee of the Norfolk and Western was allowed to sue the manufacturer in a strict product liability action based upon the same accident.

Despite what the parties suggest, the Court believes that neither of these cases really addresses the point raised in this Motion. The courts in *Toledo* and *Philips Petroleum* held that an operating railroad could not maintain a cause of action in product liability based upon a design defect against the owner railroad (or a manufacturer), because the design was not unreasonably dangerous and was in compliance with the rules promulgated by the Association of American Railroads. The present case does not involve an allegation of a design defect; rather, Burlington claims that Conrail was negligent in inspecting and maintaining the railroad car, and the negligence led to the derailment after Burlington Northern came into possession of the car. Therefore, neither case directly addresses the question of whether the AAR rules themselves preclude a claim by an operating railroad against an owner railroad after the operator has taken possession of the railroad cars.

This issue was presented in *Torres v. Southern Pacific Transportation Company*, 584 F.2d 900 (9th Cir.1978) (cited by both the *Toledo* and *Philips Petroleum* courts), where the court held that under Arizona law, the owner railroad was not the type of provider of an allegedly defective product that would be held strictly liable for product defects in a suit brought by persons injured in a train derailment. In the course of reaching that conclusion, the *Torres* court explained that the owner railroad was not the operator at the time of the derailment, and added:

"It is well established that the duty to discover and remedy defects in railroad cars lies primarily with the operating carrier. The A.A.R. rules impose a duty on the part of the operating carrier to inspect the interchange cars at every interchange point, and they relieve the originating carrier of all responsibility for the car once the interchange has been effected. (*See* A.A.R. Rule 1, 89(g)(8).)" 584 F.2d at 901.

The Court noted a number of cases which held that an originating carrier is relieved of all legal liability once it has surrendered control of the railroad car at the interchange point, and other cases in which the courts have imposed liability upon the originating carrier because the defect in the railroad car was of a type which could have been discovered by a reasonably thorough inspection of the car prior to the interchange. The Court noted that the record contained evidence of inspections made by both the originating carrier and the operator and stated that it was undisputed that the cause of the derailment was a "hot box," an operational malfunction which does not give rise to an inference of a detectable defect. Therefore, the Court granted summary judgment in favor of the originating carrier and against the injured plaintiffs on the issue of negligence as well as strict liability. The Court added:

> "Moreover, it seems clear that even in those jurisdictions which do recognize some lease-relationships as a basis for the application of the doctrine of strict liability, the highly specialized industry-use interchange program to be found in this case is too dissimilar to the commercial distribution of a product to warrant the doctrine's application." *Id.* at 902.

This case, too, even though it does address the issue more directly than the Illinois cases, places a great deal of emphasis on the policy underlying strict liability when it suggests that the interchange rules create a relationship among railroads which prevents the application of the doctrine of strict liability. Additionally, the *Torres* case involved damage caused by a "hot box." The evidence presented in the cases involving the "hot box" condition indicate that it is most commonly brought on by insufficient lubrication. Because lubrication must be applied to the bearings throughout the use of the railroad car, the responsibility for inspection and lubrication properly lies with the operating railroad. Although it is only speculation, the Court suggests that it is this factual circumstance which led the Courts in *Toledo* and *Torres* to conclude that the operating railroad and the injured plaintiff could not bring a claim against the owner who had turned the car over to the operator.

The situation in the present case is different, in that the Third–Party Complaint is based upon negligence and not upon a design defect or a condition which the operating railroad must continuously monitor and maintain.

A case which took a different approach to a similar set of facts is *Chicago, Rock Island and Pacific Railroad Company v. Chicago and Northwestern Railway Company,* 280 F.2d 110 (8th Cir.1960), a case which the *Torres* Court cited for the proposition that the Federal Safety Appliance Act, 45 U.S.C. § 1 *et seq.* imposes liability for a defective railroad car solely on the carrier operating the car at the time of the accident. In *Rock Island,* the Eighth Circuit affirmed the judgment of the trial court, which allowed the Chicago and Northwestern Railway to obtain contribution for one-half of the amount for which the Chicago and Northwestern had settled a lawsuit with an injured employee. The employee of the Chicago and Northwestern was injured by a defective handbrake. In the lawsuit brought by the Chicago and Northwestern, the operating railroad, against the Rock Island & Pacific Railroad, the owner railroad, the Eighth Circuit held that the Chicago and Northwestern was entitled to contribution because of the Rock Island Railroad's negligence in failing to deliver a reasonably safe car to the Chicago and Northwestern Railway. The Court (as mentioned in *Torres*) held that the injured employer could maintain an action under the Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq.,* for violations of the Federal Safety Appliance Act, 45 U.S.C. § 1, *et seq.* against only the Chicago and Northwestern Railway because the Act is a protection for employees and the Chicago and Northwestern was the employer of the injured brakeman at the time he was injured. However, the Court also found that the owner railroad was liable to the injured person (and to the operating railway for contribution), because the owner railroad had breached the common law duty to provide a reasonably safe railroad car.

The Court reached this conclusion even though the Rock Island Railroad argued that the Codes of Car Service and Interchange Rules, promulgated by the Association of American Railroads, operated as a waiver of, or bar to, any claim for indemnity or contribution by the Chicago and Northwestern against the Rock Island Railroad. The Court quoted from Rule 1A, which reads, "Each railroad is responsible for the condition of all cars on its line, and must give to all equal care as to inspection and lubrication," and Rule 7, which provided that a receiving road would be responsible for the cars. Nevertheless, the Court concluded that the railroads did not specifically waive any legal right pertaining to indemnity or contribution. The Court explained:

> "We are unable to detect any language therein which, even by inference, could be construed as constituting a waiver of, or bar to, the legal right of one railroad member to seek indemnity or contribution from another member. There is no reference of any kind in the rules to indemnity or contribution. In our view, the rules are solely designed to govern the care and maintenance of cars belonging to one carrier while in possession of another." 280 F.2d at 113.

The Court believes that this quotation from the Eighth Circuit in the *Rock Island* case comes the closest to explaining the nature of the current AAR Interchange Rules. The AAR rules were not meant to cover situations involving personal injuries, and it is unlikely that they are meant to apply to property damage situations where one railroad claims that the other was negligent. Moreover, since the time that this Motion was filed, the Plaintiffs have amended their Complaint (with leave of Court) to include claims against both Burlington Northern and Conrail. As has been indicated in the pleadings on this Motion, Conrail cannot argue that the Interchange Rules insulate it from the Plaintiffs' claims, because the Plaintiffs are not parties to the AAR rules.

Therefore, the Court orders that the Third Party Defendant's Motion for Summary Judgment is DENIED, and the issue of the Third Party Defendant's negligence prior to the interchange with Burlington Northern is still a triable issue of fact in this case.